JONES KNITTING CORPORATION, the Russell Manufacturing Company, Inc., Union Underwear Company, Washington Mills Company, West Knitting Corporation, Oneita Knitting Mills and P. H. Hanes Knitting Company, Plaintiffs,

v.

John E. MORGAN and John E. Morgan Patents, Inc., Defendants.

Civ. A. No. 25348.

United States District Court
E. D. Pennsylvania.

Jan. 5, 1965.

See also D.C., 244 F.Supp. 219.

Roberts B. Larson and William R. Hinds, of Larson & Taylor, Washington, D. C., and Ernest R. von Starck, of Mor-

gan, Lewis & Bockius, Philadelphia, Pa., for plaintiffs.

Henry N. Paul, Jr., Robert B. Frailey and Harold S. O'Brian, Jr., of Paul & Paul, Philadelphia, Pa., for defendants.

CALEB M. WRIGHT, District Judge.

Some recitation of the facts is necessary to form a background for this, the second phase of a protracted litigation between these parties.

On June 24, 1958 United States Patent No. 2,838,909 was issued to John E. Morgan.[1] The patent application covered a "knitted fabric". Morgan claimed that this patent gave him proprietary rights to "knitted circular thermal fabric and garments" made by using his patent.[2]

On June 27, 1958, J. E. Morgan Knitting Mills, on Morgan's behalf, sent the following telegram to seventeen large buyers of underwear:

"We are happy to announce that we have, as of June 24, 1958, been formally granted patent # 2839909 giving us proprietary rights to knitted circular thermal fabric and garments made from same. This fabric and garments embodying heat entrapping cell pockets and shrink control characteristics are now legally purchasable only from us."

Morgan's announcement caused consternation among manufacturers of circular knit thermal underwear which imitated the newly patented fabric. Several of these manufacturers contacted Robert D. McCabe, managing director of the Underwear Institute and Thomas O. Moore, president of the Institute and vice chairman of P. H. Hanes Knitting Company.[3] At the behest of Moore and McCabe a meeting of interested companies, excluding J. E. Morgan Knitting Mills, Inc., was called in New York on July 16, 1958. At the outset, both Moore and McCabe stressed that the meeting was not an Institute matter.[4]

Representatives of twelve companies attended the meeting. It was decided that an attorney should be retained by the twelve (the plaintiff group) to make a search of the new patent and render an opinion as to its validity. Each company pledged $2,000 to pay counsel fees and to be used to defend any one of the group which might be sued for infringement.

At this July 16 meeting the plaintiff group also made an agreement which defendants claim produced an illegal boycott. Since it is this boycott which concerns the court here, the offending agreement will be carefully focused upon in the succeeding pages. For the moment, however, it can be stated as defendant, Morgan, sees it:

(1) No member was to approach Morgan individually regarding a license until after completion of the search, without first consulting with the others, and

(2) in the event Morgan approached any member of the group, that member would do nothing until after he had notified the others in the group.[5]

A second meeting of the plaintiff group was held in New York on September 16, 1958. At that meeting, the attorney who had been retained by the group, Roberts B. Larson, reported that, in his opinion, the Morgan patent was invalid. He posed several courses of action to be considered by those present. The group could take licenses under the patent; continue to make and sell the fabric and wait to be sued for infringement; or bring a declaratory judgment action to have the patent declared invalid.

After hearing their attorney's procedural alternatives, the members of the plaintiff group determined to institute a declaratory judgment action in the name

1. On August 22, 1958, the patent was assigned to the other defendant, John E. Morgan Patents, Inc. This corporation is owned by Morgan and his wife. Both defendants are referred to collectively in this opinion as "Morgan".

2. Pre-trial Order, ¶ 5.

3. T.R. 1956–57, 1976.

4. T.R. 1955–57.

5. Defendants' Main Brief re the Boycott Issue, p. 8.

of those knitting mills which had already received cease and desist notices from Morgan. It was further agreed that each company would contribute $5,000 to bring the action and to defend any infringement suit which might be brought against a member of the group. The portentous agreement of the July meeting that no member would negotiate with Morgan without notifying the others was to continue in effect until a judicial decision was obtained.

One company, Standard Knitting Mills, was reluctant to join the group. Standard favored an attempt to negotiate with Morgan. On September 17, 1958, however, Standard, too, advised Hyman Rothbart, treasurer of the Union Underwear Company who presided at the September meeting, that it would participate in financing the declaratory judgment action and in the agreement that the twelve mills "will not enter into separate or individual agreement with Morgan pending outcome of the declaratory action or unless they advise the other members of the group that they are taking steps to enter into an individual agreement with Morgan." [6]

On September 23, 1958 the declaratory judgment action to declare the patent invalid was brought in this court. At that time the defendants counterclaimed for patent infringement. Subsequently, defendants requested permission to add a second counterclaim charging violation of the antitrust laws and unfair competition. The court granted leave to file an amended answer and counterclaim.

On April 10, 1964, the court held the Morgan patent invalid on the basis of indefiniteness of claims, anticipation in the prior art, and lack of invention. Jones Knitting Corporation v. John E. Morgan, 244 F.Supp. 219 (C.A. 25,348, E.D.Pa. April 10, 1964). This opinion deals with defendants' second counterclaim.

In the counterclaim defendants charge:

" * * * the plaintiffs have agreed, combined and conspired among themselves to seek to induce, and have in fact induced, others not parties to this action to join with them in forming a group to boycott and to refuse to deal with defendants, and have agreed, combined and conspired with and among themselves and with and among such others to refuse to accept any license under said Morgan patent and, if approached by said defendants John E. Morgan or John E. Morgan Patents, Inc., to refuse to deal with defendants or to discuss with defendants the terms under which such patent licenses might be granted." [7]

To support this charge, defendants point to the July 16 agreement. They do not claim that formation of a group to take action against a patent and prorate the expense of litigation is unlawful.[8] However, defendants assert that the agreement went beyond this. They charge that when a group and its members agree to refuse to deal with a patent owner, and act collectively to relinquish or inhibit their individual freedom

---

6. DX–218.

7. Amended Answer and Counterclaim, Count II, ¶ 11.

8. Defendants are emphatic on this point. "There is no question that the group's belief of invalidity of the patent justified their formation of a defense group, their pooling of funds and their institution of this declaratory judgment action." Defendants' Main Brief re the Boycot Issue, p. 30.

    The defendants' position may be sound. Certainly there is danger that without such "warchests" persons with a valid claim might be denied access to courts, especially in this day of big and expensive patent and antitrust litigation.

    Nonetheless, group action of any sort runs the risk of being cast in simple terms of "ganging up on the little guy." "The harsh judicial attitude toward group boycott stems partly from the assumption that group action directed against individuals involves an inherent imbalance in economic power, which may or may not be true depending on the relative market position of the individual and the group considered as a unit. * * *" Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 Pa.L.Rev. 847, 875–876.

in doing so, they overstep the lawful boundary of combination.

■ Group boycotts are per se violations of the Sherman Act. Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961). A group boycott is group action to coerce third parties to conform to the pattern of conduct desired by the group or to secure their removal from competition. Concerted refusals to buy are no less a violation of the antitrust law than concerted refusals to sell.[9] Thus, group action to refuse to take a license runs afoul of the Sherman Act as a group boycott and transgresses § 1 of the Sherman Act.

While there is disagreement as to the effect of the July 16 undertaking, there is general agreement as to its outline.

Harold W. Bennett, one of the participants at the July 16 meeting made contemporaneous notes in which the following appears:

> "No member approach Morgan until after a report of search without consulting the rest of group or that Morgan approach the group they notify the rest of group. Carried."[10]

Robert D. Devereaux, another participant, wrote his attorney concerning the action of the group on the day after the meeting:

> "It was decided, first, that no one would have any dealings directly or indirectly with Mr. Morgan in regard to licensing without notifying the others."[11]

McCabe also made a memorandum of what transpired at the July 16 meeting:

> "It was moved by John Gregory and seconded by Fully Huntley that no one of the group present would

approach Morgan in any way or in the event that he approaches one of them no one would deal with him without notifying the others."[12]

McCabe interpreted this motion as an agreement among the participants "that they would not deal with Mr. Morgan without consulting the other members of the group."[13]

It seems plain that the participants at the July 16 meeting did not contemplate an across the board refusal to deal with Morgan with regard to licenses but only an undertaking to notify the other members of the group should they decide individually to negotiate with Morgan.

Taking this characterization of the agreement, defendants argue that the intent of the parties was inimical to the purpose of the antitrust laws. By requiring such communication, defendants argue, the group hoped to ensure that its members would refrain from dealing individually with Morgan. "Subjecting each members' individual freedom to negotiate to prior review by the others effectively snuffed out that freedom."[14]

■ Plaintiffs argue that the July 16 agreement did not constitute a group boycott. They maintain that it is only reasonable that joint plaintiffs should keep one another advised of individual settlement negotiations. But plaintiffs agreement went farther than that. They agreed not to negotiate with Morgan without first communicating with the others. Their individual freedom was impeded, however slightly, by the promise to communicate before acting. It does not matter that each plaintiff considered himself to be free to negotiate with Morgan. Each had, in fact, circumscribed his freedom by promising not to take a license until he had informed the others, should he contact Morgan or be contacted by Morgan.

9. Barber, supra, p. 847, n. 1.

10. DX–306, p. 4.

11. PX–54.

12. DX–155.

13. DX–237, p. 167.

14. Defendants' Main Brief re the Boycott Issue, pp. 28–29.

Thus a group was formed not only for purposes of bringing suit, but also for purposes of refusing to negotiate with Morgan for licenses. Whether or not the plan was designed to allow the group to force a dissenter back into line—by peaceful persuasion or overt coercion—and whether or not any individual considered his freedom of action impeded, that freedom was in fact impeded. The freedom of each plaintiff to deal freely with Morgan was restrained by the requirement of giving notice.

The Court is aware that the mechanics of giving notice could in fact be an insignificant factor. A given plaintiff's freedom to act might be diminished only by the time and effort necessary to make a phone call or dictate a telegram. Usually when § 1 of the Sherman Act is concerned, restraint of trade by persons acting in concert means *undue* restraint of trade. House of Materials, Inc. v. Simplicity Pattern Co. Inc., 298 F.2d 867 (2 Cir. 1962). But where the per se rules are in effect, a given activity is condemned out of hand and a court may not sift the reasonableness of the restraint, however minor, or look to justification for it.

To be sure it has been asserted that the per se rule laid down by the Supreme Court in Klor's will not be followed when economic profit is not the underlying cause of the boycott or where there is justification for the boycott [15] and it has been argued cogently that a boycott test not geared to the effect on competition is unmanageable.[16]

Here this Court has found a group boycott. Since the Supreme Court has declared such group boycotts illegal per se, this Court must find that plaintiffs have restrained trade in violation of § 1 of the Sherman Act.

However, since this Court has found the Morgan patent invalid, Morgan suffered no damage because of the group boycott. If by some conceptual machination damage could be shown, it would be de minimus. If, absent the group boycott, it is reasonable to assume some one of the twelve would have taken a license and thus paid royalties to Morgan, Morgan would have been unjustly enriched since he did not have a valid patent from which a valid license could stem.

The foregoing opinion is adopted as the Court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52 (a), 28 U.S.C.A.

---

**15.** Note, 62 Columbia L.Rev. 475, 490 and note 72. See also "Joint Ventures and Boycotts: Some Suggestions on Per Se," 15 Stanford L.Rev. 638.

**16.** See Rahl, Per Se Rules and Boycotts Under the Sherman Act, 45 Univ. of Virginia L.Rev. 1165 at 1168, 1172.