Jerome H. LEMELSON, Plaintiff,

v.

The BENDIX CORPORATION and Brown & Sharpe Manufacturing Company, Defendants.

Civ. A. No. 82–308 CMW.

United States District Court, D. Delaware.

Aug. 24, 1984.

Roderick R. McKelvie, of Ashby, McKelvie & Geddes, Wilmington, Del., for plaintiff.

William H. Sudell, Jr., and Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Bendix Corp.; Noel C. Crowley, Southfield, Mich., of Allied Corp., Morristown, N.J., of counsel.

Allen M. Terrell, Jr. of Richards, Layton & Finger, Wilmington, Del., for Brown & Sharpe Mfg. Co.; William L. Patton of Ropes & Gray, Boston, Mass., of counsel.

Joseph J. Farnan, Jr., U.S. Atty. and Sue L. Robinson, Asst. U.S. Atty., Wilmington, Del., for U.S. Government; Thomas J. Byrnes of Dept. of Justice, Washington, D.C., of counsel.

## MEMORANDUM OPINION

CALEB M. WRIGHT, Senior District Judge.

This action was filed by plaintiff Jerome H. Lemelson (hereinafter "Lemelson") against defendants The Bendix Corporation (hereinafter "Bendix") and Brown & Sharpe Manufacturing Company (hereinafter "Brown & Sharpe") on June 1, 1982. The complaint essentially alleges that Bendix and Brown & Sharpe unlawfully "combined and conspired with one another to boycott Lemelson" and refused to negotiate independently with Lemelson to take a license under his patents in violation of the antitrust laws. (Complaint ¶ 17) (Dkt. No. 1). The answers of defendants deny the material allegations of the complaint.

Presently pending before the Court is plaintiff's motion to compel the production of certain documents which the defendants and the United States Government claim to be protected by the attorney-client privilege and work product doctrine. The documents at issue have been submitted to the Court for *in camera* inspection. After a careful review of those documents, the Court finds that defendants and the government have generally met their burden of establishing that the documents are protected by the attorney-client privilege and work product doctrine. The Court also finds that plaintiff has not met his burden of establishing a prima facie case of conspiracy to violate the antitrust laws sufficient to vitiate attorney-client or work product protection. Accordingly, an order will be entered denying plaintiff's motion to compel with respect to most of the documents in issue.

FACTS

This case has a long and complicated factual history. However, for purposes of this motion, the Court believes that a brief summary of the relevant events will be sufficient. Plaintiff, a holder of numerous patents, began in the late 1960s to contact various manufacturers of coordinate measuring machines, including defendants, in an attempt to induce these manufacturers to take a license under certain patents which plaintiff believed to be infringed by these machines. From 1969 to 1973, there were numerous contacts between plaintiff and defendants regarding whether defendants would take a license under plaintiff's

patents. Both defendants persistently refused to take a license, believing that plaintiff's patents were invalid and that their machines were non-infringing. *See* Exhibit A to Plaintiff's Opening Brief in Support of His Motion to Compel (Dkt. No. 134). From 1973 to 1979, there was no apparent contact between plaintiff and defendants. During that period of time, defendants marketed computer-controlled coordinate measuring machines (hereinafter "CCMMs") and sold them, *inter alia,* to the United States Navy, Army, DOE and NASA.[1] Plaintiff, believing his patents to be infringed, filed an administrative claim with the Navy. In 1979, with his administrative claim still unresolved, he brought suit in the United States Claims Court. Both Bendix and Brown & Sharpe voluntarily entered that suit as third-party defendants.

After the Claims Court litigation was filed, plaintiff, in December, 1979, again wrote to both defendants, seeking a license and a settlement of his patent infringement claims. In January, 1980, Bendix responded, indicating again that, while the company was willing to discuss settlement, it did not believe that plaintiff's patents were valid or that its machines infringed plaintiff's patents. Subsequent discussions did not result in settlement. *See* Exhibit B–1 to Plaintiff's Opening Brief in Support of His Motion to Compel (Dkt. No. 134). In March, 1980, the law firm of Barlow & Barlow, outside counsel for Brown & Sharpe, responded to plaintiff, stating that, while there was no basis for plaintiff's claims, they were willing to discuss the matter. Settlement discussions with Brown & Sharpe also occurred; however, plaintiff's demands again were refused. *See* Appendix A to Brief of Brown & Sharpe in Opposition to Plaintiff's Motion to Compel (Dkt. No. 139) (Deposition of William Jackson).

In March, 1980, the law firm of Pennie & Edmonds filed an appearance on behalf of both defendants in the Claims Court litigation. On April 7, 1980, John Kidd, a partner at Pennie & Edmonds, and lead counsel in the Claims Court litigation, wrote to William Jackson, plaintiff's attorney in the Claims Court litigation, objecting to Jackson's direct contact with the parties. *See* Exhibit A–2 to Plaintiff's Opening Brief in Support of His Motion to Compel (Dkt. No. 134). Plaintiff alleges that the appearance of Pennie & Edmonds as joint counsel, and the letter of Kidd dated April 7, 1980, resulted in the frustration of promising settlement discussions and the prevention of direct discussions between plaintiff and each of the defendants. Defendants allege that direct discussions with each defendant continued to occur and that the joint counsel arrangement in the Claims Court litigation did not interfere with their individual freedom of action in pursuing settlement with plaintiff.

Subsequent to the appearance of Pennie & Edmonds as joint counsel in the Claims Court litigation, settlement discussions with each defendant did in fact occur.[2]

---

1. According to plaintiff, defendants are the leading United States manufacturers of CCMMs and account for substantially more than one-half of such sales in the United States. *See* Plaintiff's Opening Brief in Support of His Motion to Compel at 5 (Dkt. No. 37).

2. Plaintiff's settlement discussions with Brown & Sharpe after the appearance of Pennie & Edmonds as joint counsel are set out in Brown & Sharpe's Brief in Opposition to Plaintiff's Motion to Compel at 6 (Dkt. No. 139). According to Jackson, individual settlement discussions with officers of Brown & Sharpe took place without the presence of joint counsel on several occasions. In the late spring or summer of 1980, Jackson met with Richard Duncan, Brown & Sharpe's Treasurer, at the offices of Brown & Sharpe in Rhode Island. At that meeting, Duncan refused plaintiff's demand of $350,000. In February of 1981, plaintiff made a demand of $500,000; this offer expired without acceptance. On June 25, 1981, plaintiff and Jackson met with James Hayes, in house counsel for Brown & Sharpe, in New York. At that meeting, Hayes offered $15,000 and plaintiff refused. Subsequent discussions did not produce a settlement; but even during the Claims Court trial, Jackson was told by Kidd to contact Hayes if he wanted to discuss settlement with Brown & Sharpe.

Plaintiff's settlement discussions with Bendix after the appearance of Pennie & Edmonds are set out in Exhibit A to Bendix's Answering Brief in Opposition to Plaintiff's Motion to Compel (Dkt. No. 140) (Jackson deposition). At Jack-

**16**

However, plaintiff's subsequent offers were rejected and the Claims Court trial commenced. The Claims Court, in an Opinion dated June 26, 1983, rejected plaintiff's claims and held that the machines sold by defendants and used by the government did not infringe plaintiff's patents.[3] *See Lemelson v. United States*, 3 Cl.Ct. 161, 171 (1983). Before the Claims Court rendered its decision, plaintiff sued defendants in this District, alleging a conspiracy in violation of Section One of the Sherman Act.[4] The present motion to compel was filed in an attempt to uncover evidence to support plaintiff's allegations. Plaintiff argues that he has established a prima facie case of conspiracy and that any protection afforded to the documents submitted to the Court for *in camera* inspection by the attorney-client privilege or work product doctrine has been vitiated. Defendants claim that no prima facie case of conspiracy has been established and that the protection afforded by the attorney-client privilege and work product doctrine remains intact. For the reasons discussed below, the Court agrees with defendants.

DISCUSSION

 In determining plaintiff's motion to compel, the first and most obvious point is that the parties who invoke the attorney-client privilege have the burden of establishing both the existence of the attorney-client relationship and the confidential nature of the communication. *See, e.g., U.S. v. Flores*, 628 F.2d 521, 526 (9th Cir.1980);

*U.S. v. Kelly*, 569 F.2d 928, 938 (5th Cir. 1978). Similarly, the party claiming work product protection must show that the disputed documents were prepared in anticipation of litigation or for trial by or for that party or by or for that party's representative. Fed.R.Civ.P. 26(b)(3). Often, as in this case, the determination of whether documents are protected by the work product doctrine and the attorney-client privilege is made by *in camera* inspection.

 Typically, work product protection can be overcome only by a showing "that the party seeking discovery has substantial need of the materials in preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3). In addition, both the attorney-client privilege and work product protection can be overcome by a showing that the documents claimed to be protected were made in furtherance of a crime or fraud. *See In re Grand Jury Proceedings*, 604 F.2d 798, 802–03 (3d Cir. 1979) (crime/fraud exception applies to both work product doctrine and attorney-client privilege); *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136, 155 (D.Del.1977) (same). In order to overcome work product and attorney-client protection through the crime/fraud exception, the moving party bears the burden of showing: (1) a prima facie case of crime or fraud ("such as to subject the opposing party to the risk of non-persuasion if the evidence as to the

---

son's request, settlement discussions with Kenneth Seaman, in house counsel for Bendix, took place without the presence of joint counsel on numerous occasions. As a result of these discussions, a meeting between plaintiff and officers of Bendix was held in New York without counsel for either side in attendance. That meeting failed to produce a settlement; however, even during the Claims Court trial, Jackson was told by Kidd to contact H.G. Massung, in house counsel for Bendix, if he wanted to discuss settlement with Bendix.

**3.** That decision is now on appeal before the Court of Appeals for the Federal Circuit. Oral argument before the Federal Circuit was held on March 6, 1984 and the parties now await a decision by that Court.

**4.** At this point in the litigation, plaintiff primarily relies on the following facts to establish his claim of conspiracy: (1) the December 7, 1979 meeting of defendants in which they agreed that "a strong unified approach against Mr. Lemelson is mandatory"; (2) the government attorney's comments during a March 25, 1980 telephone conversation that plaintiff would face a "united front"; (3) the March, 1980, appearance of Pennie & Edmonds as joint counsel and Kidd's objection, by letter dated April 7, 1980, to direct discussions between Jackson and defendants; and (4) various occasions on which settlement information relating to one defendant was exchanged or made known to the other defendant. *See* Plaintiff's Supplemental Memorandum in Support of His Motion to Compel at 3–6 (Dkt. No. 164).

disputed fact is left unrebutted"),[5] and (2) that the communications were made in furtherance of the fraud. *Id.* at 155.

■ In deciding plaintiff's motion to compel and in applying the legal principles discussed above to the facts of this case, the critical issue (assuming that defendants have met their burden of establishing attorney-client and work product protection) is whether plaintiff has established a prima facie case of conspiracy to refuse to negotiate independently or to refuse to take a license under plaintiff's patents in violation of the antitrust laws. If plaintiff has established a prima facie case, then the Court must also consider whether plaintiff has demonstrated that the documents at issue were made in furtherance of the conspiracy.[6] If no prima facie case has been established, then the protections of the attorney-client privilege and work product doctrine should remain inviolate.

A prima facie case could be established by either direct or circumstantial evidence showing an agreement among defendants refusing to take a license or to negotiate with plaintiff. It could also be shown by evidence of an agreement not to take any action with respect to settlement or licensing without notifying and seeking the approval of the other members of the conspiracy.[7] *See Jones Knitting Corp. v. Morgan,* 244 F.Supp. 235, 238 (E.D.Pa.1965), *aff'd. in pertinent part,* 361 F.2d 451 (3d Cir.1966). Plaintiff concedes that he has no direct evidence of an agreement preventing settlement negotiations or licensing except upon terms acceptable to the group. However, plaintiff argues that the circumstantial evidence here is sufficient to establish a prima facie case. In addition to evidence of the joint counsel arrangement and several meetings and correspondence between the defendants in the Claims Court litigation, plaintiff points to a number of depositions and documents which arguably suggest that defendants exchanged information regarding settlement negotiations. Plaintiff argues that such an exchange necessarily restricted each defendant from acting independently. Plaintiff, therefore, concludes that the exchange of settlement information through the device of joint counsel violated the antitrust laws by displacing an individual pattern of decision making with what, in essence, amounts to a group boycott. *See* Plaintiff's Opening Brief in Support of His Motion to Compel at 8–9 (Dkt. No. 134); Plaintiff's Reply Brief in Support of His Motion to Compel at 6–8 (Dkt. No. 141).

However, plaintiff's argument suffers from a "leap in logic" by assuming that the

5. Some courts have required that the prima facie showing be based on evidence exclusive of the disputed documents themselves, *see, e.g., United States v. Shewfelt,* 455 F.2d 836, 840 (9th Cir.1972); *Kockums Industries v. Salem Equipment,* 561 F.Supp. 168, 171 (D.Or.1983), while other courts have considered both the independent evidence and the disputed documents in determining whether a prima facie case has been shown, *see, e.g., In re Berkley Co.,* 629 F.2d 548, 553 (8th Cir.1980). The Court does not need to resolve that issue here since, under either standard, plaintiff has failed to demonstrate a prima facie case. In fact, the disputed documents submitted to the Court for *in camera* inspection lend further support to defendant's position that no conspiracy or refusal to negotiate independently with plaintiff ever existed. Therefore, even assuming *arguendo* that the Court should consider the disputed documents themselves in determining whether plaintiff has established a prima facie case, plaintiff has not satisfied his burden of proof.

6. The Court notes that plaintiff has made no showing at all with respect to this requirement of the crime/fraud exception. Moreover, the Court is convinced, after carefully viewing the documents *in camera,* that none of the documents were prepared in furtherance of the alleged conspiracy to violate the antitrust laws. Instead, the documents were prepared in order to effectively litigate the Claims Court action.

7. As stated in *Gould v. Control Laser Corp.,* 462 F.Supp. 685, 692–93 (M.D.Fla.1978), *aff'd.,* 650 F.2d 617 (5th Cir.1981): "Unless [plaintiff] can prove that each participating member of the group agreed, as alleged, not to recognize the validity of the patent and not to accept licensing except upon terms approved by the group, [plaintiff's antitrust] claim must fail." The crucial inquiry is whether plaintiff has produced evidence of an agreement among defendants which had the effect of restraining individual freedom of action and preventing settlement negotiations or licensing except upon terms acceptable to the group.

exchange of settlement information, in the context of a joint defense with common counsel representing both of the alleged conspirators, constitutes prima facie evidence of an agreement not to settle or take a license except upon terms approved by the group. None of these circumstances support plaintiff's conspiracy claim. First, as plaintiff concedes, defendants had a right to take joint legal action and to hire joint counsel in response to a common problem. Their joint defense, standing alone, cannot provide any basis for antitrust liability. *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F.Supp. 1100, 1155–57 (E.D.Pa.1983), *rev'd. in part and aff'd. in part*, 723 F.2d 238 (3d Cir.1983) (Noerr-Pennington doctrine protects joint defense of legal proceedings from Sherman Act liability absent showing that litigation is pursued in bad faith as mere sham). Second, defendants' attendance at meetings concerning plaintiff's infringement claims, particularly in the context of a joint defense, is insufficient without more to give rise to any inference of conspiracy. *Id.* at 1149 (attendance at meeting is insufficient without more to give rise to inference of conspiracy). Finally, defendants' exchange of settlement information is, in the absence of any evidence that the exchange restrained individual freedom of action, insufficient to permit an inference of conspiracy since, as Judge Becker has recently pointed out, no case has ever held that the mere exchange of information, in itself, is a vio-

lation of the antitrust laws.[8] *Id.* at 1150–52.

Indeed, in the circumstances of this case, where each defendant independently refused to take a license or settle with plaintiff long before the joint defense of the Claims Court litigation began, where other third party defendants present at the December 7, 1979 meeting did in fact settle with plaintiff after the joint defense began, and where individual settlement discussions with both Bendix and Brown & Sharpe continued after the appearance of common counsel, it is inherently implausible to suggest that the exchange of settlement information had the effect of restraining individual freedom of action. Absent some evidence that the exchange of information had such an effect, it is difficult to see how there could be any possible anticompetitive consequences violating Section One of the Sherman Act. As I suggested in *Jones Knitting Corp. v. Morgan, supra*, 244 F.Supp. at 239, it is entirely reasonable for joint defendants to keep each other advised of individual settlement negotiations. What was illegal in *Jones Knitting Corp. v. Morgan* was the conspirators' agreement to communicate with and gain the approval of each other before negotiating. The illegality of that agreement was based on the restraining effect it had on each individual company's freedom of action. Here, by contrast, there is no evidence of any promise that one defendant would seek the ap-

---

**8.** The fact that defendants exchanged settlement information can be viewed as evidence that defendants were aware of each other's actions and therefore engaged in consciously parallel business behavior. However, the Third Circuit has consistently held that proof of consciously parallel business behavior, without more, is insufficient evidence of an agreement in violation of the antitrust laws unless the circumstances under which the parallel behavior occurred make the inference of rational independent choice less attractive than that of concerted action. These circumstances include a showing of acts by defendants in contradiction of their own economic interests and satisfactory demonstration of a motivation to enter an agreement. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 114 (3d Cir.1980); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55

L.Ed.2d 791 (1978); *Venzie Corp. v. United States Mineral Products*, 521 F.2d 1309, 1314 (3d Cir.1975). Here, while both defendants determined to refuse to take a license from plaintiff and could thus be found to have engaged in parallel business behavior, there is nothing to suggest that defendants acted against their independent economic interests in refusing to settle or that defendants had any motive or reason to limit their individual freedom by agreeing to refuse to deal with plaintiff. In this situation, the inference that defendants independently refused to settle is much more plausible than an inference that their refusal was the result of concerted action. Therefore, the Court concludes that, absent proof that defendants' actions were against their independent economic interests, the exchange of settlement information is insufficient to permit an inference of conspiracy.

proval of the other before negotiating, nor is there any evidence that each defendant's refusal to settle was in any way influenced or affected by the other's. At best, the evidence shows that counsel may have informed each defendant of settlement decisions or information made or known by the other. In these circumstances, the Court cannot conclude that plaintiff has met his burden of establishing a prima facie case of a conspiracy in violation of the antitrust laws. Accordingly, any protection afforded to the documents submitted for *in camera* inspection by the attorney-client privilege or work product doctrine should remain intact.

An appropriate Order shall be entered.