Jerome H. LEMELSON, Plaintiff,

v.

The BENDIX CORPORATION and Brown & Sharpe Manufacturing Company, Defendants.

Civ. A. No. 82–308 CMW.

United States District Court, D. Delaware.

Nov. 18, 1985.

See also, Cl.Ct., 8 Cl.Ct. 789.

William H. Sudell, Jr., and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Noel C. Crowley, of Allied Corp., Morristown, N.J., of counsel, for defendant, The Bendix Corp.

Allen M. Terrell, Jr., of Richards, Layton & Finger, Wilmington, Del., William L. Patton, of Ropes & Gray, Boston, Mass., of counsel, for defendant, Brown & Sharpe Manufacturing Co.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This antitrust action arises out of patent infringement litigation brought by a patentee, Jerome H. Lemelson, against the United States. The infringement action, which was commenced in the Court of Claims on September 4, 1979, alleged that the government's use of certain coordinate measuring machines ("CMMs"), purchased from suppliers other than Lemelson, infringed on his patent claims. Two of the government's CMMs suppliers, Bendix Corporation (hereinafter "Bendix"), and Brown & Sharpe Manufacturing Co. (hereinafter "Brown & Sharpe"), voluntarily entered the Court of Claims action as third-party defendants. The suppliers had significant interests in contesting the infringement action because of an indemnification clause contained in their contracts of sale with the government. The clause, in effect, required each supplier to reimburse the government for damages for which it was liable as a result of a finding that Lemelson's patent had been infringed by the use of each supplier's product.

The action presently before the Court, which was filed on July 1, 1982, is against Bendix and Brown & Sharpe. The complaint essentially alleges that the two defendants combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, (hereinafter "Section 1"), by refusing to negotiate in good faith with Lemelson for settlement of the Court of Claims action. The core of the conspiracy, according to Lemelson, was the defendants'

Roderick R. McKelvie, of Ashby, McKelvie & Geddes, Wilmington, Del., for plaintiff.

refusal to enter into a licensing agreement with the plaintiff. The unlawful "group boycott" was allegedly effected through an agreement providing for the sharing of litigation expenses in the Court of Claims action. In addition, plaintiff claims that the purported agreement prohibited either defendant from acting unilaterally with respect to Lemelson's demands and required each corporation to share with the other all information regarding settlement offeres before negotiating or entering into a patent licensing agreement with the plaintiff. Complaint ¶ 17 (Dkt. No. 1). The answers of defendants deny the material allegations of the complaint. (Dkt. Nos. 33 & 35).

Presently before the Court are defendants' separate motions for summary judgment which have been pending since the middle of 1983. (Dkt. Nos. 44 & 45). The Court deferred consideration of the merits of those motions pending completion of discovery on the issue of the existence of a conspiracy between the two defendants in violation of the antitrust laws. The discovery cut-off date was extended on several occasions. During this extended discovery period, the Court issued an opinion denying plaintiff's motion to compel the production of documents which the defendants and the United States Government claimed were protected by attorney-client privilege and work product. *Lemelson v. Bendix Corporation*, 104 F.R.D. 13 (D.Del. 1984). Briefing of defendants' motions for summary judgment resumed in April of 1985.

The narrow issue presented by defendants' motions is whether plaintiff has adduced sufficient evidence from which a trier of fact could infer the existence of a conspiracy in violation of Section 1 of the Sherman Act. This Court has already addressed this issue in connection with its ruling that defendants would not be required to produce documents protected by attorney-client privilege. Although plaintiff argues that additional evidence produced since the Court's earlier ruling supports a different finding, the Court, after reviewing plaintiff's evidence in its entirety, reaffirms the conclusion it reached in its earlier

decision—namely, that plaintiff has failed to establish a prima facie basis for inferring the existence of an unlawful conspiracy. Accordingly, defendants' motions for summary judgment with respect to plaintiff's antitrust claims will be granted.

## I. FACTS

Plaintiff, a holder of numerous patents, began in the late 1960s to contact various manufacturers of CCMs, including defendants, in an attempt to induce these manufacturers to take a license under certain patents which plaintiff believed to be infringed by their machines. From 1969 to 1973, there were numerous contacts between plaintiff and Brown & Sharpe regarding whether it should take a license under plaintiff's patents. *See* Plaintiff's Opening Brief in Support of His Motion to Compel, Exhibit A (Dkt. No. 134). For no apparent reason, Lemelson's contacts with Brown & Sharpe ceased after 1973 and appear to resume in 1979.

Plaintiff had also contacted Bendix regarding purported infringing products prior to 1979. Lemelson wrote to Bendix in July of 1975, claiming that Bendix's automatic inspection machinery was infringing. *See* First Affidavit of William Jackson, Exhibits J–9A–9D (Dkt. No. 195). Once again, the correspondence terminates without any resolution of Lemelson's underlying charges.

Beginning around 1975, both defendants began marketing computer-controlled CCMs and sold them, *inter alia*, to the United States Navy, Army, Air Force, Department of Energy and NASA. Plaintiff has alleged that Bendix and Brown & Sharpe are leading manufacturers of automatic measuring machines, accounting for more than one-half of such sales in the United States, and further, that they account for substantially more than one-half of the sales of CCMs in the United States. Complaint ¶ 9(a) (Dkt. No. 1).

In April of 1976, plaintiff made a written administrative claim for compensation to the Air Force, based on the belief that Brown & Sharpe's computer-controlled

CCM device, which the Air Force used, infringed on one of his patent claims. *See* First Affidavit of William E. Jackson, Exhibit E–7 (Dkt. No. 195). The claim was denied in 1979, and subsequently, plaintiff brought an action in the Court of Claims against the Government. As noted above, both Bendix and Brown & Sharpe, as government suppliers of CMMs, joined this action as third-party defendants. Their conduct in defending the Court of Claims action is the source of plaintiff's present antitrust action.

The relevant evidence in addressing the merits of defendants' summary judgment motions involves events occurring after the commencement of Lemelson's Court of Claims action on September 14, 1979. Of these events, perhaps the most significant was a meeting held on December 7, 1979, among patent attorneys for the government suppliers and the United States Government. At that meeting, it was tentatively agreed between Brown & Sharpe and Bendix that the two would retain jointly the services of outside counsel, John Kidd, a patent attorney with the law firm of Pennie & Edmonds. *See* Plaintiff's Answering Brief in Opposition to Defendants' Motions for Summary Judgment, Exhibit C (Dkt. No. 194). According to the terms of the agreement, the two parties would split the cost of Mr. Kidd's services along with any other suppliers who decided to join them. *Id.* Mr. Kidd's initial duty would be to render a validity opinion on the Lemelson patent, and, if the dispute proceeded to trial, Mr. Kidd would function as trial counsel for Bendix and Brown & Sharpe. *Id.* A memo from the Secretary of Brown & Sharpe to the company's Treasurer concludes by saying, "All parties agree that a strong unified approach against Mr. Lemelson is mandatory." *Id.*

Prior to the formal appearance of Kidd in the Court of Claims action, Lemelson sent letters to Bendix on December 26, 1979, and to Brown & Sharpe on December 29, 1979, asking them to enter into a licensing agreement as a means of settling the Court of Claims action. *See* Plaintiff's Opening Brief in Support of His Motion to Compel,

Exhibit B–3 (Dkt. No. 134) (Bendix's response to Lemelson's letter); Plaintiff's Reply Brief in Support of His Motion to Compel, Exhibit J (Dkt No. 141). Bendix, through its Mideastern Regional Patent Counsel, Raymond Eifler, responded to Lemelson's letter with letters both to Lemelson on January 18, 1980, *see* Plaintiff's Opening Brief in Support of His Motion to Compel, Exhibit B–3 (Dkt. No. 134), and to Lemelson's attorney, William Jackson, on February 7, 1980. *See* Plaintiff's Answering Brief in Opposition to Defendants' Motions for Summary Judgment, Exhibit N (Dkt. No. 194). Bendix's response made clear its own belief that no infringement had occurred, but also expressed a willingness to reassess its position upon receipt of additional information from Lemelson. Jackson attempted to follow up the Eifler letter with a telephone call to explore the prospects of settlement, but Eifler remained adamant in insisting that the scope of the infringement dispute be defined with greater precision. *See* Plaintiff's Opening Brief in Support of His Motion to Compel, Exhibit B–4 (Dkt. No. 134).

Lemelson's letter to Brown & Sharpe was circulated to Bendix, as evidenced by a document identifying a letter from an in-house attorney at Bendix to Brown & Sharpe's outside counsel, Herbert Barlow, Jr. *See* Plaintiff's Answering Brief in Opposition to Defendants' Motions for Summary Judgment, Exhibit K (Dkt No. 194). Brown & Sharpe, through Barlow, did not respond to Lemelson's letter until March of 1980. For the most part, Brown & Sharpe advanced a position similar to Bendix. This led to a telephone conversation between Jackson and Barlow in which Jackson made an offer in which Lemelson would grant Brown & Sharpe a retroactive license in return for a payment of between $600,000 and $700,000. *See* Deposition of William E. Jackson, 40–48 (Dkt. No. 123). This offer was rejected and was promptly followed by a second offer from Jackson seeking only $350,000. *Id.* No formal response to this offer was made for fifteen months.

On March 6, 1980, John Kidd of Pennie & Edmonds entered a formal appearance in the Court of Claims action on behalf of Bendix and Brown & Sharpe. Shortly thereafter, Jackson contacted the Government's attorney, David Spevack, and the two discussed the possibility of settlement. Jackson contends that he was informed by Spevack that, as a practical matter, plaintiff would be faced with a "united front" from the defendant and the third-party defendants. Jackson confirmed his understanding of Spevack's remarks by letter. *See* Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment, Exhibit G (Dkt. No. 194).

On April 7, 1980, Kidd wrote to Jackson objecting to Jackson's continuing direct communication with Kidd's clients without notifying Kidd. Kidd stated emphatically, "I believe you were required, by the Code of Professional Conduct to automatically refer all future matters to counsel and refrain from communicating with clients represented by counsel. I assume and expect that you will promptly curtail such tactics in the future." *Id.*, Exhibit H. The letter read in context seems to have been prompted by discovery requests made by Jackson, but the precise context of Kidd's remarks could be read to include settlement negotiations as well.

Regardless of what Kidd meant, intermittent settlement negotiations with Bendix and Brown & Sharpe continued over the next two years. Sometimes these negotiations were conducted by Kidd and sometimes they were negotiated separately with representatives of each corporation without Kidd's presence. The first communications regarding settlement with Bendix after Pennie & Edmonds' appearance came in October of 1980. The meeting was held at Pennie & Edmonds' offices and was attended by Eifler for Bendix and Jackson on behalf of Lemelson, along with attorneys from Pennie & Edmonds. It dealt only with preliminary settlement issues. *See* Deposition of William E. Jackson 70–72 (Dkt. No. 123).

On November 7, 1980, Jackson met with Eifler alone to discuss settlement and received a generally negative response. *See id.* at 74; First Affidavit of William E. Jackson, ¶ 8a (Dkt. No. 195). Jackson submitted a new offer to Bendix in February of 1981 seeking almost $650,000 spread over three payments. He received no response to this offer.

At about the same time, Jackson travelled to Rhode Island to have lunch with two Brown & Sharpe officials, R.J. Duncan, the corporation's treasurer, and A.C. Sauerbrey, the corporation's secretary. Jackson was informed that $350,000, mentioned almost a year before, was too high, although Brown & Sharpe remained willing to discuss settlement. *Id.* at 49–50. Jackson protested that Brown & Sharpe's sales figures justified such a licensing fee. Subsequently, Jackson wrote a letter restating Lemelson's terms for settlement but increasing the settlement figure to $500,000, spread over three payments. *See id.* at 51–52. Brown & Sharpe did not respond, nor did it have any communications with Jackson again regarding settlement until June 26, 1981. At that time, the General Counsel for Brown & Sharpe, James W. Hayes, accompanied by Kidd, personally delivered a letter to Lemelson who was accompanied by Jackson. The letter contained an offer of settlement for about $15,000. *Id.* at 53–54. Although Jackson sent at least one letter to Kidd with a copy to Hayes responding in greater detail to issues raised by the Hayes letter, there were no further direct meetings regarding settlement after the Hayes meeting between Jackson and Lemelson on the one hand, and Brown & Sharpe personnel on the other. *See* First Affidavit of William E. Jackson, Exhibit J–13 (Dkt. No. 195).

The next significant episode in the settlement negotiations, according to the plaintiff, was a series of so-called "joint" offers made by Kidd on behalf of both defendants. The first of these came in December of 1981 at the deposition of Jerome Lemelson noticed in connection with the Court of Claims action. During a break in the deposition, Kidd allegedly approached Jackson

and informally inquired whether Lemelson would be willing to accept a $100,000 payment from each defendant in settlement of the infringement claims. *See* Deposition of William E. Jackson 57–59 (Dkt. No. 123).

Apparently the offer was not accepted because three months later during the course of a telephone conversation between Kidd and Jackson, a new offer surfaced. According to Jackson, Kidd suggested a $200,000–$300,000 figure. *Id.* at 123–60. Jackson attempted to clarify the terms of the exploratory offer in a letter dated March 8, 1982, *see* Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment, Exhibit T (Dkt. No. 194), which was hand delivered by Jackson to Kidd in a meeting held on March 11, 1982. This was followed by a letter from Jackson to Kidd dated March 23, 1982, confirming his oral understanding that the dollar sum represented what each defendant would pay. *See Id.* at Exhibit U. In the March 23rd letter, Jackson also requested Kidd to provide him with the name of a Bendix official whom he could contact for purposes of conducting direct settlement negotiations.

Kidd appears to have provided Jackson with the name of Kenneth Seamen, a Bendix patent attorney, because a memo dated April 1, 1982, from Seamen to a supervisor reports a telephone conversation with Jackson. *See* Plaintiff's Opening Brief in Support of His Motion to Compel, Exhibit B–7 (Dkt. No. 134). Moreover, at the same time, Seamen wrote to Kidd requesting a copy of all correspondence regarding settlement negotiations involving Bendix over the last two months. *See* Plaintiff's Reply Brief in Support of His Motion to Compel, Exhibit H–1 (Dkt. No. 141). Within a month, Kidd wrote a letter to Bendix chief in-house patent counsel, William Thornton, recounting details regarding previous settlement discussions with Jackson. *See* Plaintiff's Answering Brief in Opposition to Defendants' Motions for Summary Judgment, Exhibit Q (Dkt. No. 194).

In the meantime, Bendix officials had arranged two meetings, one with Jackson and Lemelson together and another with Lemelson alone. In the first of these meetings, Seamen met with Lemelson and Jackson to discuss settlement. *See* First Affidavit of William Jackson ¶ 8(c) (Dkt. No. 195). Further discussions were held between another Bendix official and Lemelson in a brief layover at La Guardia Airport. *Id.* at ¶ 9.

On June 2, 1981, this action was filed in the District Court of Delaware. Shortly thereafter, trial in the Court of Claims action commenced. Early in the trial, Jackson asked Kidd and received from him the names of individuals from each company authorized to discuss settlement. *See* Deposition of William Jackson 65–67 (Dkt. No. 123). Jackson never contacted the company officials.

## II. THE REQUIREMENT OF UNLAWFUL CONCERTED ACTION

■ Section 1 of the Sherman Act is directed exclusively at anticompetitive conduct that is the result of concerted action.[1] Although Section 1 by its terms refers to contracts, combinations or conspiracies in restraint of trade, it has long been recognized that this disjunctive triad reduces to the single requirement of concerted action. *See Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 111 (3d Cir.1980).

The sole issue presented by defendants' motions is whether there is sufficient evidence of an unlawful conspiracy to merit trial. In evaluating the sufficiency of the evidence in support of plaintiff's case on summary judgment, the Court must, of course, view the evidence in a light most favorable to the non-moving party. *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Moreover, this

---

1. Section 1 states in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

Court is mindful that the function of a court on summary judgment is not to try the facts but solely to determine whether there are facts to be tried. The present motions, however, do not call upon this Court to resolve conflicting evidence regarding the underlying facts, an exercise that would clearly implicate the trier-of-fact's function to credit or discredit evidence. Rather, defendants' motions seek to test as a matter of law the limits of what can be permissibly inferred from the evidence.

■ Fed.R.Civ.P. 56(c) places the initial burden of establishing the absence of any genuine issue of material fact on the moving party. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Defendants have carried this initial burden by denying plaintiff's allegation of unlawful conspiracy. Although defendants concede the existence of an agreement between them, they contend the substance of the agreement amounts to nothing more than a joint defense agreement, and accordingly, it should be exempt from antitrust scrutiny. *Zenith Radio Corp. v. Matsushita Electronic Industrial Co.,* 513 F.Supp. 1100, 1157 (E.D.Pa.1981) (Becker, J.), *rev'd. on other grounds,* 723 F.2d 238 (3d Cir.1983), *cert. granted on other grounds,* —— U.S. ——, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985). Defendants also anticipate evidence to be presented by plaintiff, arguing that the evidence is entirely consistent with the mere existence of an agreement to share litigation costs and that it provides an insufficient basis from which to infer the existence of a conspiracy.

This record is strong enough to shift the burden to the non-moving party under Rule 56(e) to set forth specific facts showing that there is a genuine issue for trial. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592-93, 20 L.Ed.2d 569 (1968). In this case, the non-moving party's burden translates into establishing a prima facie case of conspiracy.

Plaintiff relies exclusively on circumstantial evidence to meet this burden. As a general rule, the law does not distinguish between the efficacy of direct and circumstantial evidence. Indeed, in the case of conspiracy, it has long been recognized that direct proof of an express agreement is certainly not required and is rarely available. *See Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 111 (3d Cir. 1980).

■ In relying exclusively on circumstantial evidence, however, plaintiff must overcome the inherent limitations· on the use of circumstantial evidence: "the circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Venture Technology, Inc. v. Natural Fuel Gas Co.,* 685 F.2d 41, 45 (2d Cir.1982) (*quoting American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)). In short, inferences based on circumstantial evidence must be reasonable and not merely speculative.

■ What is reasonable under the circumstances is determined by the laws of logic and common sense. *In re Japanese Electronic Products,* 723 F.2d 238, 304 (3d Cir.1983), *cert. granted on other grounds,* —— U.S. ——, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985). Plaintiff contends that so long as the underlying circumstantial evidence is merely consistent with the conclusion he ultimately seeks to infer, then the inference is reasonable and this Court is required on summary judgment to make it, as the most favorable inference for the non-moving party. This Court cannot agree. Circumstantial evidence must meet a higher threshold than mere consistency to guarantee that inferences are not wholly speculative. Where, as here, there are at least two plausible versions of the facts— one legitimate and the other illegitimate— some piece of circumstantial evidence must make the existence of a conspiracy more likely, if only slightly, than the explanation of the facts proffered by the defendants before that evidence can be credited as a

reasonable basis for inferring the existence of a conspiracy.

Some years ago, this Court in *Jones Knitting Corp. v. Morgan*, 244 F.Supp. 235 (E.D.Pa.1965), *aff'd. in part and rev'd. in part*, 361 F.2d 451 (3d Cir.1966), considered the additional quantum of cooperation necessary to make a joint defense agreement actionable under the antitrust laws. There, this Court held that restrictions, contained in a joint defense agreement, constituted a *per se* violation of the antitrust laws. The agreement required participants to notify other members of a trade association of the terms of any settlement offer before negotiating with plaintiff. The Court reasoned that any restriction on the freedom of the participants to negotiate with plaintiff, no matter how slight, fell within the scope of the blanket prohibition on concerted refusals to deal.

The breadth of the strict rule announced in *Jones Knitting* has been criticized. *See Gould v. Control Laser Corp.*, 462 F.Supp. 685, 690–91 (M.D.Fla.1978), *aff'd.*, 650 F.2d 617 (5th Cir.1981). And arguably the *per se* approach adopted in *Jones Knitting* no longer reflects recent refinements in the Supreme Court's application of the *per se* rule, *see e.g.*, *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), especially with respect to concerted refusals to deal. *See generally Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, — U.S. —, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985); *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).

Although recognizing the limitations of its *Jones Knitting* decision, this Court cannot agree with plaintiff's assertion that it abandoned *Jones Knitting sub silentio* in its previous decision on plaintiff's motion to compel. This Court's reservations regarding whether defendants' conduct should be evaluated under a *per se* or rule of reason standard, or any other reservations regarding the rule announced in *Jones Knitting*, are simply beside the point with respect to

the Court's previous decision or defendants' present motions. In both cases, the Court is merely concerned with the existence of a prima facie case of conspiracy which, as the Court emphasized in its last opinion, requires evidence from which it is reasonable to infer some restriction on the freedom of the defendants to negotiate settlements with the plaintiff independently. *See Lemelson I, supra*, 104 F.R.D. at 18–19.

### III. PLAINTIFF'S EVIDENCE OF AN UNLAWFUL CONSPIRACY

Plaintiff focuses on a number of different aspects of this case to give *prima facie* support to the allegations contained in his complaint: (1) the December 1979 meeting; (2) the indemnification agreement; (3) the defendants' sharing of settlement information; (4) Pennie & Edmonds' role in settlement negotiations; (5) the totality of the circumstances; and (6) the failure to reach a settlement. With respect to each of these areas, plaintiff's argument is basically the same: the circumstantial evidence is not inconsistent with the existence of a conspiracy, and therefore, the Court has a reasonable basis for inferring that a conspiracy did in fact exist. The summary of plaintiff's evidence below makes clear that the circumstantial evidence on which he relies makes any inference of a conspiracy speculative at best.

#### (1) The Meeting

This Court, in its earlier decision, rejected plaintiff's suggestion that the meeting of December 7, 1979, by itself was evidence of a conspiracy. The purpose of this meeting, according to defendants, was to organize a joint defense in the Court of Claims action, an interpretation borne out by one of the participants' contemporaneous notes. *See* Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment, Exhibit C (Dkt. No. 194). This Court has no reason to reconsider its earlier decision unless plaintiff can offer some evidence suggesting the purpose of the meeting was unlawful.

The fact that the meeting itself preceded formal adoption of any joint defense agreement is of little or no consequence. Obviously, any joint defense agreement would have to be preceded by negotiations regarding the terms of the agreement. Plaintiff's suggestion to the contrary would result in a "Catch-22" situation for defendants. Antitrust immunity for joint defense agreements would provide little solace if negotiations regarding the agreement constituted an independent basis for antitrust liability.

Plaintiff makes much of the fact that Bendix allegedly recognized the possibility that it might be found liable for patent infringement. Such a possibility undoubtedly crosses the mind of any party sued for infringement, and is a reflection more of prudence rather than guilt. Recognition by a defendant of potential liability in entirely separate legal proceedings, however, does not shed any light on plaintiff's antitrust allegations. The possibility of liability suggests a reason for entering into a joint defense agreement as much as an incentive for engaging in an antitrust conspiracy.

Plaintiff also notes that Bendix was the principal force behind the joint defense agreement and that Brown & Sharpe prior to the meeting had decided not to participate in the Court of Claims action. These additional allegations, even assuming their truth, are of only passing interest. Any agreement must have its genesis in some train of events. The particular train of events in this case appears completely ordinary. The details emphasized by plaintiff are irrelevant to resolving the crucial question of whether the purpose of the meeting was unlawful.

■ The only piece of evidence that even arguably suggests an improper intent among the participants of the meeting is a statement by a corporate officer from Brown & Sharpe that the participants agreed on the need for a "strong unified approach against Mr. Lemelson." *Id.* at Exhibit C. The use of the imperative tone perhaps imparts more of a conspiratorial flavor to the proceedings than anything else to which plaintiff has been able to point, but standing alone it is just too little. The expression could just as easily refer to the joint defense as to an unlawful conspiracy.

### (2) *The Indemnification Agreement*

■ Plaintiff contends that the government's attorney in the Court of Claims action, David Spevack, repeated the "united front" expression in a telephone conversation with Mr. Jackson, and elaborated further that the government would not consent to a settlement unless any settlement involving one of the companies had the approval of the other company. According to plaintiff, Spevack's understanding was a "natural" consequence of the indemnification clauses contained in the contract of sale each supplier entered with the government. Although defendants point to the terms of the clauses to refute plaintiff's interpretation of the conversation, *see* Government's Reply Brief (Dkt. No. 174) (on motion to compel) (discussing construction of indemnification clauses), on a motion for summary judgment, the Court is bound to credit the non-moving party's version of the facts. Even assuming that Spevack made the statement attributed to him, however, the statement is not evidence from which the existence of a conspiracy could be inferred.

First, the statement fails to establish any connection between what may have been the government's position and the existence of an unlawful conspiracy between Bendix and Brown & Sharpe. There is nothing to show that Bendix and Brown & Sharpe assented to Spevack's representations except a self-serving letter, drafted by plaintiff's counsel in the Court of Claims action, which was sent to the defendants.

■ More importantly, the remarks attributed to Spevack by Jackson are inadmissible as hearsay. Spevack and the government are not parties in this action. Although the government is not a party to the present action, plaintiff might contend that it is a co-conspirator of the defendants

and that Spevack's remarks were made in furtherance of a conspiracy. It is well-established, however, that before statements of a co-conspirator can be regarded under Fed.R.Evid. 801(d)(2)(E) as beyond the scope of the rule against hearsay, it is necessary for the party who wishes to offer the statement in evidence to produce independent evidence of the existence of the conspiracy and the alleged co-conspirator's membership in it. *In re Japanese Electronic Products,* 723 F.2d 238, 260–64 (3d Cir.1983), *cert. granted on other grounds,* —— U.S. ——, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985); *see also Glasser v. United States,* 315 U.S. 60, 74, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). Since the purpose of the present motion is to test plaintiff's *prima facie* evidence of conspiracy, and the admissibility of statements of a co-conspirator presupposes the existence of a *prima facie* case, the merits of the present motion must be resolved prior to admitting any statements of an alleged co-conspirator.

### (3) *Defendants' Sharing Of Settlement Information*

During the period following the meeting in December of 1979 but prior to April 7, 1980, there was communication between the two defendants regarding their respective positions in response to settlement offers each had received from Lemelson. Bendix circulated to Brown & Sharpe a draft of a letter sent to Lemelson and a copy of another letter sent to Jackson. Similarly, Brown & Sharpe, through its outside counsel, provided Bendix with a draft of its response in the same period.

In addition, there is evidence that Pennie & Edmonds may have been an indirect source of information to each defendant regarding settlement offers made to the other defendant. *See, e.g.,* Plaintiff's Answering Brief in Opposition to Defendants' Motions for Summary Judgment, Exhibit R (Dkt. No. 194).

Although the Court was aware of much of this evidence in its prior decision, it nevertheless concluded that the evidence did not provide an independent basis for inferring the existence of a conspiracy because it entailed a "leap of logic" between conduct which is not prohibited by the antitrust laws and the existence of a conspiracy. *See Lemelson I, supra,* 104 F.R.D. at 18. The Court sees no reason to revise its earlier conclusion.

 Even if defendants' occasional sharing of settlement information was regarded as a form of conscious parallel business behavior, there would still be an insufficient basis for inferring the existence of concerted action. To establish a conspiracy from parallel business behavior, a party must be able to show that the defendants' acts are in contradiction to their legitimate economic interests. *Venzie Corp. v. United States Mineral Products Co.,* 521 F.2d 1309, 1314 (3d Cir.1975). As this Court noted in its earlier decision, neither the voluntary sharing of information nor the fact that neither defendant reached a settlement with plaintiff indicates that either defendant was acting contrary to its own private economic interests. *See Lemelson I, supra,* 104 F.R.D. at 28 n. 8. A plaintiff suing different parties for the same reason creates an incentive among the adverse parties to cooperate in the preparation of their respective defenses. Under the circumstances, it would be impossible reasonably to infer otherwise.

### (4) *Pennie & Edmonds' Role In Settlement Negotiation*

Plaintiff contends that defendants' decision to retain Pennie & Edmonds is evidence consistent with the existence of a conspiracy, and moreover, that Pennie & Edmonds performed a crucial role in furtherance of the conspiracy by coordinating settlement negotiations. If antitrust immunity for actions taken in connection with a joint defense is to have any meaning, it must include immunity for the actions of counsel and those who rely on counsel's advice so long as their actions fall within the legitimate scope of a joint defense. Thus, the legal significance of plaintiff's contentions turns on an understanding of

the permissible scope of counsel's actions for antitrust purposes in conducting a joint defense.

▉▉▉▉ The mere retention of common counsel is certainly within the permissible limits of a joint defense. Presumably, immunity also would encompass the authorization of counsel to conduct settlement negotiations. Antitrust concerns could conceivably be triggered if the participants subordinated their independent judgment in dealing with a plaintiff to the collective judgment of the entire group of participants. Such a situation might arise if all decision-making authority were reposed in counsel or if counsel were permitted to withhold one client's acceptance of settlement on condition of plaintiff's acceptance of another client's settlement offer.

None of the instances cited by plaintiff suggests that Pennie & Edmonds, acting as joint counsel, ever exceeded the legitimate bounds of permissible conduct. Although plaintiff alleges that Brown & Sharpe deferred all judgment in favor of Pennie & Edmonds, the allegation, in the opinion of the Court, is conclusory in nature and is based upon a misreading of a deposition.

▉▉▉▉ Plaintiff further suggests that using Pennie & Edmonds to conduct all settlement negotiations would raise antitrust difficulties. Although it is clear from Jackson's first affidavit that negotiations were not always supervised by Pennie & Edmonds, even if Pennie & Edmonds had participated in all negotiations, such an arrangement does not constitute an antitrust violation. The crucial concern for purposes of antitrust scrutiny is the locus of decision-making power, and as long as there is not evidence that a defendant has surrendered its decision-making capacity, there is no basis for antitrust liability.

▉▉▉▉ Plaintiff points to what it contends were "joint" offers of settlement as proof of the illicit role played by Pennie & Edmonds in the settlement negotiations. The record does not disclose, however, whether the offers to which plaintiff refers were conditioned on the acceptance of both de-

fendants' offers. Accordingly, the most that can be said from the record is that Pennie & Edmonds, on more than one occasion, presented simultaneous settlement offers from both defendants. Since plaintiff never attempted to accept the offer of a single defendant, it is impossible to say whether that option was available to plaintiff. When plaintiff expressed a desire to arrange talks with only one defendant in his letter of March 23, 1982, to Kidd, he was given the name of a Bendix official unconditionally.

### (5) *The Totality Of The Evidence*

▉▉▉▉ Admittedly the totality of the evidence may serve as a basis for inferring the existence of a conspiracy even when individual pieces of evidence might prove insufficient when viewed alone. Such is not the case here. The reason is that the individual pieces of evidence relied on by plaintiff do not fit into a coherent pattern. For instance, plaintiff regards both the sharing of information by Bendix and Brown & Sharpe and Pennie & Edmonds' role, as joint counsel, as evidence of a conspiracy. But if, as plaintiff alleges, Pennie & Edmonds did coordinate settlement negotiations, it is difficult to understand why it would also be necessary for Bendix and Brown & Sharpe to exchange settlement information. In contrast, defendants' version of the facts does offer a consistent account of the evidence.

For this reason, the Court cannot say that the totality of the evidence makes inference of conspiracy any less speculative than inferring it on the basis of any individual piece of evidence to which plaintiff has referred.

### (6) *The Failure To Settle*

Plaintiff, having failed to adduce any evidence of a conspiracy, concludes its brief by throwing off yet another theory of antitrust liability. After three years of litigation, the plaintiff informs the Court that "the issue … is Bendix and Brown & Sharpe's lack of good faith in pursuing [the Court of Claims'] litigation." The plaintiff

cites as evidence of his contention, the fact that together Bendix and Brown & Sharpe may have spent more than a million dollars in defending against Lemelson's claims, a sum presumably greater than that for which Lemelson was willing to settle.

Although plaintiff maintains that defendants' expenditures were willingly incurred to drive him out of business, he ignores the fact that it was he who chose to sue defendants. Nor is plaintiff bothered by the fact that the defendants initially prevailed on the merits in the Court of Claims' action. That decision was substantially affirmed on appeal. *Lemelson v. United States*, 752 F.2d 1538 (Fed.Cir.1985).

The factual infirmities in plaintiff's argument only serve to highlight the underlying weakness of his theory. There is simply no rule of law which prohibits parties from spending more on their defense than it would take to settle the case, nor does such conduct provide a basis for inferring the existence of a conspiracy. Plaintiff's argument, if taken seriously, would sever the concept of antitrust liability from any traditional understanding of competitive injury.

An order granting summary judgment to defendants on plaintiff's antitrust claims will issue.