Gordon GOULD, Plaintiff,

v.

CONTROL LASER CORPORATION et al., Defendants.

No. 78-344-Orl-Civ-Y.

United States District Court,
M. D. Florida,
Orlando Division.

Nov. 27, 1978.

Richard I. Samuel, William L. Mentlik, Westfield, N. J., William F. Simonet, Orlando, Fla., for plaintiff.

Robert W. Duckworth, Orlando, Fla., Stewart R. Dalzell, Edward M. Posner, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION

GEORGE C. YOUNG, Chief Judge.

This cause is before the court on a number of defense motions which seek, alternatively or cumulatively, to compel the joinder of an additional party plaintiff, to dismiss the complaint and amended complaint, and to grant summary judgment. The court heard argument on the motions on October 18, 1978, and rendered oral rulings from the bench disposing of each motion. This opinion incorporates those rulings and more fully explains the reasons why the court ruled as it did.

## I. THE MOTION TO JOIN REFAC AS AN INDISPENSABLE PARTY PLAINTIFF

By this motion defendants seek to compel the joinder of Refac International Limited (Refac), a publicly held Nevada corporation, as a party plaintiff, or alternatively to dismiss the complaint pursuant to Fed.R.Civ.P. 19(b). The motion is predicated upon the April 2, 1975 licensing agreement between plaintiff Gould and Refac, under which Refac acquired a substantial interest in and control over Gould's patent. Defendants maintain that Refac's interest in the patent, and hence in the outcome of this litigation, warrants its joinder as an indispensable party plaintiff.

The only evidence before the court pertinent to this issue is the licensing agreement, the affidavits of Burton Bernard and Eugene Lang and, to the extent that it can be regarded as evidence, a *Barrons* article discussing the Gould patent. On the basis of this record it seems clear that Refac is an indispensable party whose joinder is required by Rule 19.

The licensing agreement confers upon Refac almost unconstrained control over the Gould patent. Refac is the exclusive licensee, possessed of the "non-transferable right to license or otherwise exploit" the use of the patent. The exclusivity of Refac's rights have no geographical limitations; they are truly world-wide in scope. Nor are Refac's exclusive rights limited as to time; only the expiration of the patent, barring unlikely contingencies such as bankruptcy or insolvency, will divest Refac

of its control over the Gould patent. More importantly, the rights conferred by the licensing agreement are nearly as unlimited in scope as they are in duration and geographical application. All of the significant decisions respecting exploitation and licensing of the patent are to be made by Refac. Gould as a practical matter may have considerable input in the decision making process, but under the agreement it is Refac, and Refac alone, who has the right to decide. Gould's only enforceable right to influence the licensing and exploitation process is conferred by Section 7 of the agreement, which affords him a measure of discretion to disapprove prospective licensing and manufacturing agreements:

> "Refac shall furnish to licensor true copies of any license and other manufacturing agreements or amendments thereto issued by Refac pursuant hereto. Prior to executing any such agreements Refac shall submit to licensor for approval the financial and other terms of substance proposed for adoption thereunder and licensor shall act promptly upon and shall not unreasonably withhold its approval thereof."

But as defendants note, this discretionary right of disapproval is significantly constrained by the duty to act seasonably and to withhold approval only where objectively reasonable under the circumstances. Thus even as to the end products of Refac's licensing efforts—prospective licensing and manufacturing agreements—Gould is restricted in the degree to which he may control the exploitation of his patent.

Under traditional property law concepts Gould is the owner of the patent. But ownership so substantially limited in enjoyment is not in any realistic sense ownership at all. Under the terms of the licensing agreement Refac's control over the Gould patent is so sweeping that it has become in economic reality the assignee of the patent. Gould has transferred all but the right to half the royalties and a limited right of veto over the agreements which Refac negotiates. The considerations of finality, judicial economy and fairness which underpin Rule 19 demand under these circumstances that Refac be brought into the litigation.

There can be little question but that, had it elected to do so, Refac could have prosecuted its own independent patent infringement action against the defendant. Numerous decisions have recognized the right of an exclusive patent licensee with substantial ownership rights to prosecute an enforcement action. *See generally*, 3A Moore's Federal Practice ¶ 19.14[2.–2]. Since it is a "proper party" with an obviously substantial interest in the patent and in the success of this litigation, an order compelling Refac's joinder would work no unfairness to either Refac or Gould.

Furthermore, in the absence of Refac as a party there can be no assurance that any final judgment rendered in this action would be of any real legal consequence. In the event that the judgment is adverse to Gould on the issue of the patent's validity, Refac might well feel free to relitigate the issue in another forum. Refac's non-joinder then creates a genuine risk of multiple adjudications on the same issues and creates real doubt that this court's judgment will accord the parties the relief to which they are ultimately entitled.

In addition, if a judgment is ultimately granted in favor of Gould or if the parties effect a settlement, the absence of Refac as a party will almost certainly raise substantial questions about the res judicata effect of the settlement or the judgment, the scope of the relief granted and the adequacy of any monetary relief awarded. Can the defendants settle this case with Gould with assurance that Refac will not subsequently assert infringement claims against them? Will Refac be bound by a consent decree? If a judgment on the merits is granted in favor of Gould and Refac questions the adequacy of the relief, what then? And can Refac, in the face of a judgment adverse to Gould, initiate identical litigation in other forums perceived to be more favorable to its position?

The affidavit of Eugene M. Lang, Refac's president, does not substantially diminish the difficulties created by Refac's non-join-

der. As the court observed during the hearing, intentions are as changeable as the wind. There can be no assurance that some successor to Mr. Lang, or that the Board of Directors, will not take a contrary position and assert, perhaps with some merit, the right to protect Refac's interests in the Gould patent in a separate and individual lawsuit, the representations of Mr. Lang to the contrary notwithstanding.

Without Refac's joinder there can simply be no guarantee that defendants will not be exposed to the risk of multiple adjudications or that a final, binding judgment deciding all the issues between the parties can be entered by this court. The motion to compel Refac's joinder as a party plaintiff will therefore be granted.

## II. THE MOTION TO DISMISS COUNT TWO—THE ANTITRUST CLAIM

In Count Two of the amended complaint Gould seeks to recover treble damages under the Sherman and Clayton Acts on the basis of the defendants' participation in an alleged conspiracy to restrain trade. The theory of liability is this: the defendants and other significant members of the industry, fearing that they will be forced to pay high royalties for the licensing of the Gould patent, combined and conspired together to refuse to recognize the validity of the patent and, under the guise of a common defense fund, to coerce Gould into agreeing to license the conspirators on unfavorable terms dictated by the group.

The facts alleged in support of the complaint are essentially as follows: Gould's patent was issued October 11, 1977. Just prior to that date, when it was clear that the issuance of the patent was imminent, Gould's exclusive licensee, Refac, contacted a number of leading companies in the laser industry, including defendants Control Laser and Holobeam Laser, and advised them to consider taking a license under the forthcoming patent. Refac's overtures were uniformly rebuffed. But in response to the solicitation Control Laser, through its corporate president M. Lee McDaniel and its Board of Directors Chairman, Robert D. Van Roijen, Jr., publicly and privately called upon others in the industry to join with it in a concerted effort to oppose the validity of the patent and to refuse to accept licensing, except upon the industry's terms.

The complaint further charges that in order to bring its planned boycott to fruition, Control Laser held a conference for all companies in the industry on October 21, 1977. Just prior to the conference it succeeded in securing the over-the-telephone commitment of several companies to join the boycott. And during the conference the parties agreed, among other things, to establish a "common defense fund" the contributions to which would be based upon each member's sales of allegedly infringing goods, to challenge the validity of the Gould patent, to induce others in the industry to join the boycott in order to present a united industry front, and, further, to not accept licenses from Gould except upon terms agreeable to the entire group.

The terms of the October 21 agreement have, according to the complaint, been carried out. The industry officials attending the meeting have refused to accept licensing under the patent, have agreed to contribute to a defense fund, and have sought to induce other companies in the industry to resist licensing and join the boycott. The effect of this concerted behavior, Gould alleges, has been to prevent him from negotiating licensing agreements, and hence to enjoy the fruits of his lawful patent monopoly. Trade in the laser industry, he argues, has been adversely affected because the individual members of the boycott are by virtue of their forbidden agreement foreclosed from acting as individual economic units free to accept or to refuse licensing under the patent. Their discretion as competing firms in the same industry has thus been fettered by an agreement that each member shall refrain from dealing with Gould individually. An agreement among competitors of this type, it is asserted, must be condemned as a restraint of trade under Section 1 of the Sherman Act.

As authority for his position Gould places almost exclusive reliance upon the Third Circuit's 1966 decision in *Jones Knitting Corp. v. Morgan*, 361 F.2d 451, aff'g in pertinent part 244 F.Supp. 235 (E.D.Pa. 1965). The facts and the holding of that decision merit considerable attention. The dispute leading to the *Jones Knitting* decision began when one John Morgan obtained a patent covering "knitted fabric" and promptly asserted that his patent gave him property rights to all "knitted circular thermal fabric and garments." Morgan's claim shook the thermal underwear industry. When he solicited licenses from a number of large manufacturers, he was unanimously rebuffed, and several of the companies he had solicited promptly contacted the director of the Underwear Institute and requested industry-wide action against Morgan. The Institute called a meeting of all interested companies for the purpose of discussing Morgan's patent claims. Representatives from twelve concerns attended the meeting and agreed to take concerted action against Morgan. An attorney was retained to search the patent and it was agreed that until an opinion on the patent's validity had been prepared, none of the members of the group would accept a license without first consulting the others. Shortly thereafter counsel submitted an opinion finding that Morgan's patent was invalid, and on his advice the group members voted to institute a declaratory judgment action in the name of those who were already involved in the legal dispute with Morgan. A common defense fund was established and each of the participants agreed not to take a license without first consulting the others.

Morgan responded to the suit by filing counterclaims for patent infringement and antitrust violations. He prevailed on the antitrust counterclaim, but, significantly, the district court did not condemn the entire "common defense" arrangement. It was completely lawful, the court intimated, for competitors to agree that a patent with industry-wide applicability is invalid and to act on that belief by forming a defense group, pooling funds and instituting a suit for declaratory relief. The participating concerns in *Jones Knitting* ran afoul of the Sherman Act only because they had agreed that no member of the group would at any time during the course of the litigation take a license from Morgan without first consulting the other members. The district court reasoned that competitors could not consistently with Section One of the Sherman Act so circumscribe the freedom of their individual actions:

"Plaintiffs argue that the July 16 agreement did not constitute a group boycott. They maintain that it is only reasonable that joint plaintiffs should keep one another advised of individual settlement negotiations. The plaintiffs agreement went farther than that. They agreed not to negotiate with Morgan without first communicating with the others. Their individual freedom was impeded, however slightly, by the promise to communicate before acting. It does not matter that each plaintiff considered himself to be free to negotiate with Morgan. Each had, in fact, circumscribed his freedom by promising not to take a license until he had informed the others

. . .

Thus a group was formed not only for the purposes of bringing suit, but also for the purposes of refusing to negotiate with Morgan for licenses. Whether or not the plan was designed to allow the group to force a dissenter back into line— by peaceful persuasion or overt coercion—and whether or not any individual considered his freedom of action impeded, that freedom was in fact impeded. The freedom of each plaintiff to deal freely with Morgan was restrained by the requirement of giving notice." 244 F.Supp. at 238–39.

Applying a rule of per se liability, the district court held that the agreement not to take a license from Morgan constituted a group boycott illegal under *Klor's Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), even though the degree of restraint upon the member's freedom to negotiate was relatively slight.

The Third Circuit unanimously sustained the district court's reasoning on the antitrust issue, emphasizing as had the court below that the competing members of the defense group had done more than merely enter into an agreement to challenge the validity of the Morgan patents. A major purpose of the group was to obtain industry-wide agreement to refuse to negotiate with Morgan for licensing and consequently " '[t]he freedom of each plaintiff to deal freely with Morgan was restrained by the requirement of giving notice' " to all the members of the group. 361 F.2d at 459. Such an agreement, the Court of Appeals reasoned, amounts to a group boycott illegal under Section One.

Gould contends that *Jones Knitting* is plainly dispositive of the dismissal motions at issue here. For just as in *Jones Knitting*, Gould argues, the members of the defense group are alleged to have done much more than merely agree to pool their resources and contest the patent; they are alleged to have agreed that no individual member would negotiate a license with Gould except upon terms approved by the group as a whole. And so just as in *Jones Knitting* the freedom of each group member has been impermissibly constrained. Furthermore, Gould argues, the goal of the group imposed restraints is clear: to forge a united front in opposition to the patent and thus to compel him to submit to the unfavorable licensing demands of the participating laser producers. Viewed in this context, the argument continues, the restraints imposed on trader freedom here are far more starkly anticompetitive and egregious than the restraints condemned in *Jones Knitting*.

 The defendants assert, on the other hand, that *Jones Knitting* can afford no support for Gould's antitrust claim. In the first place, they maintain, *Jones Knitting* was founded upon a doctrine of per se liability since discarded in nearly every circuit and more recently impliedly disapproved by the Supreme Court in *Continental T.V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Stripped of its per se undergirding, defendants contend, *Jones Knitting* is not authority for condemning the restraint allegedly placed upon the members of the laser defense group. Defendants additionally offer two reasons for concluding in spite of the holding of the Third Circuit that the facts alleged in Count Two, assumed to be true, cannot constitute an unlawful "boycott" in restraint of trade. First, defendants point to the settled doctrine that the Sherman Act was intended to foster and safeguard a regime of competition and that it is only when there has been injury to competition, as opposed to a competitor, that a claim under Section One can be established. *See e. g., H & B Equipment Co., Inc. v. International Harvester*, 577 F.2d 239, 245–46 (5th Cir. 1978); *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83, 88–90 (5th Cir. 1978); *Kinnear-Weed Corp. v. Humble Oil and Refining Co.*, 214 F.2d 891, 894 (5th Cir. 1954), *cert. denied* 348 U.S. 912, 75 S.Ct. 292, 99 L.Ed. 715 (1955) (patent infringement not injury cognizable under Sherman Section One). Furthermore, defendants argue, the injury to the plaintiff alleged in Count Two is not "antitrust injury" cognizable under the Sherman Act, that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). *See also* P. Areeda, *Antitrust Violations Without Damage Recoveries*, 89 Harv.L.R. 1127 (1976); *Handler, Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum.L.R. 979, 989 (1977).

The court finds considerable merit to defendants' contention that the rule of per se liability embraced by the *Jones Knitting* court has not withstood the test of time. More recent decisions, particularly in the Fifth Circuit, have rejected the application of a rigid per se standard to all concerted refusals to deal. *See, e. g., E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178 (5th Cir. 1972), *cert. denied* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). *Accord: Hatley v.*

*American Quarter Horse Assn.*, 552 F.2d 646, 653 (5th Cir. 1977); *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1364–65 (5th Cir. 1976). Experience has shown that group refusals to deal come in many varieties with differing justifications and competitive consequences—and often with at least some offsetting social and market benefits. *See generally, Drayer v. Krasner*, 572 F.2d 348, 354–57 (2nd Cir. 1978); *P. Areeda, Antitrust Analysis Section 3–e* (2d Ed. 1974). For example, some group refusals to deal may be designed to advance the group's general economic self-interest without being aimed at adversely affecting any other group's profits; others may be designed to advance social and moral objectives totally unrelated to the group's business or economic interests, and still others are undeniably designed to gain market power at the expense of other competitors. It would be foolhardy and counterproductive to judge all such concerted behavior by a unitary standard of per se illegality. For this reason modern decisions limit per se treatment to those boycotts clearly exclusionary or coercive in nature. The Fifth Circuit's decision in *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee, supra*, summarizes the modern view of group boycotts:

> "We conclude that resort to the *per se* rule is justified only when the presence of exclusionary or coercive conduct warrants the view that the arrangement in question is a 'naked restraint of trade'. Absent these factors the rule of reason must be followed in determining the legality of the arrangement." 467 F.2d at 187.

■ To the extent, then, that *Jones Knitting* rests upon the premise that all concerted refusals to deal are unlawful it is no longer authoritative, and does not necessarily require the denial of the defendants' dismissal motion. Whether the concerted activity of which Gould complains is to be judged by the per se standard or by the rule of reason depends not upon a finding that it constitutes a "boycott" but upon an analysis of its purpose and competitive impact. And judged purely from the allegations of the complaint it seems unlikely that the concerted activity alleged would be deserving of per se treatment. The purpose of the concerted activity by the defendants and their collaborators, assuming the truth of Gould's allegations, was unquestionably coercive in that it was designed to force the holder of a patent to submit to the licensing terms of the group. But the coercion was not directed at a competitor, and the participants in the boycott were not seeking to increase their market shares at the expense of competing firms. The alleged boycott thus appears not to have been the kind of exclusionary scheme so manifestly harmful to competition that it merits condemnation without inquiry into the defendants' justifications for their actions.[1]

■ The Court reaches no final conclusions on this issue, however, because it is of the opinion that even if the complaint states no per se violation, it adequately alleges a restraint of trade that could be found, under traditional rule of reason analysis, to violate the Sherman Act. And it is on this aspect of the case that *Jones Knitting* may retain some vitality. For it is alleged that each of the participants in the patent defense group agreed not to take a license from Gould except upon terms approved by the group as a whole. That agreement unquestionably restrained the freedom of each group member to act as an individual producer in the laser market, free to contract or not contract with whom it chooses. The participants in the defense group thus displaced the pattern of individual decision making that had previously prevailed in the industry and substituted in

---

1. "Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anti-competitive. As the court explained in *Northern Pac. R. Co., v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), 'there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.' ", *Continental T.V., Inc. v. GTE Sylvania, Inc., supra* at 433 U.S. 50, at 97 S.Ct. 2558.

its place a procedure of group decision making on a matter of crucial importance to the industry and to the price of lasers. The competitive consequences of such collaborative decision making cannot be determined on the basis of the pleadings. It is possible, as defendants contend, that competition in the laser product market was not adversely affected in the slightest in that only Gould, a non-competitor and a patent monopolist, was harmed. But it is also possible that Gould could produce evidence of market dislocations, affects upon the price structure in the industry, or other anti-competitive consequences flowing from the alleged refusal to deal agreement. If that were the case, then Gould could prove the requisite "public injury" cognizable by the Sherman Act and the necessary "antitrust injury" required for a private plaintiff to recover damages under the Clayton Act. The Court cannot conclude on the basis of the allegations of the complaint that Gould "would not be entitled to recover under any state of facts which could be proved in support of his claim." *Cook & Nichol, Inc. v. Plimsoll Club,* 451 F.2d 505, 506 (5th Cir. 1971). The motion to dismiss will therefore be denied.

## III. THE MOTION FOR SUMMARY JUDGMENT

As the analysis in the preceding pages has suggested, Gould's antitrust claim rests or falls on his ability to prove one crucial element of fact alleged in his complaint: the existence of a restraint on the freedom of the defense group members to purchase a license. Unless Gould can prove that each participating member of the group agreed, as alleged, not to recognize the validity of Gould's patent and not to accept licensing thereunder except upon terms approved by the group, his claim must fail. For absent evidence of such a restraint the conduct attributed to the defendants in the complaint amounts to no more than an agreement to share the costs of litigating the validity of Gould's patent. As the court in *Jones Knitting* strongly intimated and as subsequent decisions have clearly established, only in the most egregious circumstances would the Sherman Act proscribe such an agreement.

The defendants' summary judgment motion is predicated upon the premise that Gould can produce no evidence which would require a trial on this crucial issue. Their contention, in short, is that nothing in the summary judgment record would permit the inference that they and their collaborating competitors agreed not to deal with Gould. In support of this motion the defendants have tendered the depositions and affidavits of the two central characters in the alleged boycott conspiracy: McDaniel, the president of Control Laser and Van Roijen, the Chairman of its Board of Directors. The sworn statements of these men, read together with their accompanying documents, completely refute the boycott conspiracy allegations of the complaint.

McDaniel and Van Roijen do not deny that in response to Refac's licensing overtures they contacted key corporate officers in competing firms, but they state unequivocally that they requested only that these other firms consider contributing to a defense fund to be established to investigate Gould's patent and, if necessary, to finance a court test of its validity. They also do not deny that on October 22, 1977 a meeting of laser manufacturers was held at their behest. But they deny completely (1) that the participants agreed to boycott Gould or to coerce other competing firms into complying with such a boycott and (2) that they discussed minimum or acceptable royalty rates. According to McDaniel and Van Roijen the participants at the meeting agreed only to contribute to a defense fund to finance Control Laser's defense of Gould's patent infringement lawsuit. They further state that the discussion among the officers present was limited to the particulars of establishing and administering a defense fund and the possible defenses to the Gould patent. Their testimony is supported by the letter and proposed defense fund agreement drafted by Terry J. Houlihan, a San Francisco antitrust lawyer retained by the defense fund members to establish and administer an acceptable defense fund. The agreement which Houlihan drafted imposes

absolutely no restraints on the freedom of the signatories to negotiate individually with Gould. McDaniel and Van Roijen state additionally that none of the participants in the defense arrangement either individually or in combination exercised pressure on other laser producers to join this defense group. In short, McDaniel and Van Roijen paint a picture of the evidence totally contrary to the conspiracy allegations of the complaint. If their view of the evidence is accepted, the parties agreed to do nothing more than finance the defense of a lawsuit of considerable importance to the laser industry.

Gould has tendered absolutely no evidence in the form of depositions, affidavits or otherwise, in opposition to the evidence produced by the defendants. He bases his opposition to the summary judgment motion solely on his interpretation of certain selected passages of McDaniel's deposition testimony and on his contention that not all of the allegations of group coercion have been refuted. The portions of McDaniel's testimony to which Gould refers are recited in his brief and need not be repeated here. It is sufficient to say that the court has read those passages along with the remainder of McDaniel's deposition and affidavit and that the court can find nothing in McDaniel's statements from which one could infer the existence of an agreement among the group members not to deal with Gould. In his deposition testimony and affidavit McDaniel consistently and emphatically denies that such an agreement, implied or expressed, ever existed.

Gould's contention that not all of the complaint's allegations have been refuted by the defendants' testimony is completely erroneous. As recited above, the evidence tendered by the defendants contravenes each material allegation of a conspiracy in restraint of trade: the existence of agreement not to deal with Gould, the coercion of other competing firms, and the discussion of minimum or acceptable royalty rates. The defendants are required to do no more. The burden of a moving party in a summary judgment proceeding is to show that there are no genuine issues of material fact respecting the plaintiff's claim for relief. The defendants have carried that burden. It is therefore Gould's burden, as the party opposing the motion, to come forward with "specific facts showing that there is a genuine issue for trial", Fed.R.Civ.P. 56(e). The opposing party may not simply rely on the contrary allegations of his complaint. *Sweet v. Childs,* 507 F.2d 675, 679 (5th Cir. 1975). The court therefore concludes that there are no material issues of fact respecting Gould's allegations of an agreement among the parties not to take a license from and to otherwise refuse to deal with Gould. It follows that defendants are entitled to summary adjudication on the antitrust claim asserted in Count Two unless the defendants' participation in the defense fund could, by itself, arguably be found by a reasonably minded jury to constitute a restraint on trade. Nothing alleged in the complaint or appearing in the summary judgment record would permit such a jury finding here. The antitrust laws, as noted previously, ordinarily pose no barrier to an agreement among competitors to share the costs of litigation affecting their common interest, even if the goal of the litigation is clearly anti-competitive. Indeed, the constitutional rights of association and petition would in most cases shield concerted action of that nature from illegality. It is only when there is evidence of abuse of the adjudicatory processes or coercive or exclusionary conduct designed to use the courts to deprive competitors from access to the judicial process or to otherwise deter them from exercising their adjudicatory rights that the Sherman Act could be said to forbid common defense fund arrangements. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), *noted* in 86 Harv.L.R. 715 (1976); *Rush-Hampton Industries v. Home Ventilating Institute,* 419 F.Supp. 19 (M.D.Fla.1976). There is absolutely no evidence of such coercive conduct in this record. Accordingly, the court will enter an order granting the defendants' motion for summary judgment with respect to the antitrust claim asserted in Count Two.