SONY ELECTRONICS, INC., Consumer Electronics Assn., Electronic Industries, Inc., Plaintiffs,

v.

SOUNDVIEW TECHNOLOGIES, INC., Defendant.

Soundview Technologies, Inc., Counterclaim Plaintiff,

v.

Sony Corporation of America, et al. Counterclaim Defendants.

No. 3:00CV754 JBA.

United States District Court, D. Connecticut.

July 16, 2001.

Gale R. Peterson, Special Master, San Antonio, TX, pro se.

Jacqueline D. Bucar, S. Peter Sachner, Timothy P. Jensen, Tyler, Cooper & Alcorn, New Haven, CT, Richard L. DeLucia, Richard S. Gresalfi, Elizabeth A. Gardner, Kenyon & Kenyon, New York City, Richard M. Steuer, Kaye, Scholer, Fierman, Hays & Handler, New York City, Gary M. Hoffman, Dickstein, Shapiro & Morin, Washington, DC, for plaintiffs.

Garrard Russ Beeney, Jeffrey Scott, Sullivan & Cromwell, John M. DiMatteo, Michael Stacchini, Neal Feivelson, Patterson, Belknap, Webb & Tyler, New York City, James Sicilian, Eric L. Sussman, Day, Berry & Howard, Hartford, CT, for consolidated plaintiffs.

Joseph L. Clasen, Robinson & Cole, Stamford, CT, John J. Bogdanski, David S. Monastersky, Howd & Ludorf, Hartford, CT, John-Henry McKim Steele, Votre & Associates, Kenneth A. Votre, Votre & Associates, New Haven, CT, Amy S. Owen, Miles & Stockbridge, McLean, VA, Raymond P. Niro, Paul C. Gibbons, John C. Janka, Robert P. Greenspoon, Niro, Sca-

vone, Haller & Niro, Chicago, IL, Eugene M. Cummings, David M. Mundt, Cook, Alex, McFarron, Manzo, Cummings & Mehler, Chicago, IL, for defednant.

Richard M. Steuer, Kaye, Scholer, Fierman, Hays & Handler, New York City, Michael S. Culver, Oliff & Berridge, Alexandria, VA, for consolidated defendants.

## MEMORANDUM OF DECISION
### [DOC. # 159–1, # 159–2]

ARTERTON, District Judge.

Declaratory judgment defendant and counterclaim plaintiff Soundview Technologies, Inc. (Soundview) is the holder of a patent for technology related to the so-called "V-chip," a device mandated by the FCC to be included in all television sets manufactured after January 1, 2000, to allow parents to block the display of violent or sexually explicit programming, with the standards for the technology to be set by industry. Counterclaims ¶ 22. Defendants are a trade association and numerous television manufacturers who are alleged to have infringed Soundview's patent and engaged in a conspiracy to fix prices for licenses to the V-chip technology, or to refuse to deal with Soundview altogether. Counterclaim defendant Sony Corporation of America (Sony) now moves to dismiss Soundview's antitrust claim, arguing that Soundview has not sufficiently alleged antitrust injury. Oral argument was held on May 7, 2001, and this decision follows.

### Factual Background

Soundview's antitrust allegations can be summarized as follows. The industry association, known as EIA or CEMA, formed a subcommittee to discuss V-chip implementation, the "R4.3 Television Data Systems Subcommittee." Counterclaims ¶ 22. The R4.3 Subcommittee undertook to investigate "U.S. patents which might be infringed by those manufacturers who

build equipment for receiving and decoding content advisories information" using the methods contained in the EIA-formulated standard, and retained an outside patent attorney to determine "which patents exist that impact" use of this technology. Counterclaims ¶ 24. The subcommittee reported the results of its search that "[s]ome patents were found to be essential to the standard" to the R–4 Video Systems Committee, the parent committee of the R4.3 subcommittee. Counterclaim ¶ 24. A then-Soundview consultant attending the meeting at which the results were reported stated that the subcommittee acknowledged that "six patents that had been previously identified could pose a problem." Id.

EIA's investigation revealed, in total, 43 patents belonging to 40 separate entities, and communicated this information to its members, including the statement that the six patents it categorized as "most relevant" "have, generally speaking, broader claims, which are more easily infringed." Counterclaim ¶ 25. Soundview's patent, '584, was first on the list of the six "most relevant" patents identified by EIA. Id. EIA's vice-president of Engineering, George Hanover, also sent a memorandum to EIA's members outlining the possibility of enlisting the FCC to help television manufacturers "avoid unreasonable royalty demands" by, for instance, extending the effective dates of the regulations until the "intellectual property situation is resolved" or exploring the FCC's "legal ability to preempt the intellectual property rights of holders unwilling to license the use of their patents on fair and reasonable terms." Counterclaim ¶ 30. Hanover also conceded, however, that these strategies would likely "encounter serious legal and jurisdictional problems" due to the FCC's lack of authority to take such actions. Id. EIA continued to circulate the list of "po-

tentially applicable content advisory patents" to its members on several occasions, including May 1998, Counterclaim ¶ 31, and August 1999. Counterclaim ¶ 35.

On November 10, 1998 Soundview formally informed EIA, and its constituent members, of its plans to license its patent to television manufacturers on reasonable terms "on a non-exclusive, non-discriminatory basis." Counterclaim ¶ 32. EIA allegedly never responded to this letter, *id.*, but instead circulated a memorandum to its members in February of 1999 explaining:

> [EIA] is aware that the owners of several patents claim that use of their patented technology is necessary for television set manufacturers to comply with the [FCC's] regulations mandating the incorporation of the V-chip in certain television sets .... EIA, at the request of some of its members, is in the process of evaluating these patents and assessing all of the options available to television manufacturers .... [I]f any members have non-confidential information relating to the patent issues that they would like the EIA to be aware of in connection with EIA's study of the situation (such as patents called to their attention, offered license terms, relevant prior art, etc.) please provide that information to George Hanover.

Counterclaim ¶ 33. The decision to circulate the above memorandum was made during a February 17, 1999 meeting, and was allegedly accompanied by a discussion of Soundview Technologies, although the substance of this discussion is not yet known by Soundview. Counterclaim ¶ 34. Soundview finds it sufficiently ominous that its consultant attending the meeting reported that he understood the discussion would not have taken place if the participants had known that he had been retained by Soundview; shortly thereafter this consultant terminated his relationship with Soundview, citing an unidentified "conflict of interest." *Id.* Soundview also cites its failure to receive copies of the minutes for two EIA meetings (of which it is a member) discussing the V-chip, despite repeated requests, as further support for its allegation that something untoward was discussed at those meetings. Counterclaim ¶ 36.

During a telephone conversation between EIA's Hanover and Soundview's president and vice president, Hanover allegedly revealed that EIA and the industry manufacturing members actually had agreed upon a uniform price for a license under the Soundview patent: 5 cents per television set. Counterclaim ¶ 37. Soundview maintains that the above facts sufficiently allege the outlines of a conspiracy to fix prices for patent licenses relating to the V-chip and to boycott sellers of licenses.

## Discussion

Sony characterizes Soundview's antitrust claims as a strained attempt "to force the square peg of a patent dispute into the round hole of an antitrust action," and urges the Court to dismiss all antitrust claims to allow this case to proceed "to the real dispute—whether Soundview has a valid patent claim." Doc. # 160 at 8. According to Sony, Soundview's counterclaim fails to allege sufficient antitrust injury, that is, injury to the competitive process itself, and that concerted action to seek to take down a patent is not the sort of injury the antitrust statutes were meant to address. Sony also argues that stripped of the conclusory allegations, the facts alleged in the counterclaim amount to conduct that is constitutionally protected under the *Noerr–Pennington* doctrine. For the reasons that follow, the Court disagrees.

## A. *Price–Fixing Allegation*

Sony first seeks to strike the allegation that Hanover revealed to Schmidt and Lee in a phone conversation that EIA members "actually had agreed upon a uniform price for a license under the Soundview patent: 5 cents per television set." Counterclaim ¶ 37. According to Sony, it is directly contradicted by the affidavit of David Schmidt, which was submitted in opposition to Sony's motion to dismiss in the Virginia Action, and so should be disregarded by this Court. *See* Def. Ex. 5 (Soundview's Response to Sony's Motion to Dismiss), at Ex. 2 (tabbed). In his affidavit, Mr. Schmidt relates the telephone conversation as follows:

> [W]e discussed the Soundview patent and Soundview's plans to license its patent to industry companies under reasonable terms on a non-exclusive, non-discriminatory basis. Mr. Hanover stated that the industry, as represented by the television manufacturers participating in the R4.3 Subcommittee, would consider a price of 5 cents per unit for a license to be a "reasonable" price, although he expected we would not.

*Id.* at ¶ 6. Although the Schmidt affidavit was not cited or incorporated by reference in the Counterclaim, it may be considered by this Court on a Rule 12(b)(6) motion, and the information contained within it used to strike a portion of the instant counterclaim. *See, e.g., Totalplan Corp. of America v. Lure Camera Ltd.,* 613 F.Supp. 451, 461 (W.D.N.Y.1985); *Interstate Natural Gas Co. v. Southern California Gas Co.,* 209 F.2d 380, 384 (9th Cir.1953) ("[a] motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, admits all well pleaded facts, but does not admit facts which the court will judicially notice as not being true nor facts which are revealed to be unfounded by documents included in the pleadings or intro-duced in support of the motion."). Soundview has not challenged the propriety of the Court's consideration of the Schmidt affidavit in deciding the instant motion, and it is clear from the procedural history of this case that Soundview had actual notice of all the relevant information contained therein. *See Cortec Industries v. Sum Holding,* 949 F.2d 42, 48 (2d Cir. 1991) (court need not transpose Rule 12(b)(6) motion into one under Rule 56 where "plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint").

Soundview's main response to Sony's attempts to strike allegations regarding the Hanover statement is that the Schmidt affidavit does not contradict anything alleged in the counterclaims. As Soundview puts it, "rarely do people write memos saying 'let's violate the law,'" Doc. # 188 at 16, and the conversation described in Schmidt's affidavit may be simply a genteel version of the antitrust conspiracy alleged in the counterclaims. Schmidt avers that he and Hanover discussed Soundview's intentions to license its patent "under reasonable terms," and Hanover responded that the industry would consider 5 cents a set to be reasonable. This is more than Hanover's "opinion," as Sony characterizes it; in response to a statement about reasonable terms for Soundview, he directly states what the manufacturers, as represented by the industry association, would be willing to pay, indicating that there had been some discussion and at least initial agreement on this matter by EIA members. While Hanover's recollection of the conversation is surely not as compelling as the language described in the counterclaim, it is unlikely that a sophisticated business person would tell a prospective licensor that all the manufacturers had agreed to fix the price for the license, and the Court does not find

Schmidt's affidavit to be so directly contradictory with the counterclaims that the price-fixing allegation should be disregarded. Accordingly, the Court will assess the entirety of the counterclaims in determining whether Soundview has adequately alleged an antitrust claim.

## B. *Antitrust Injury*

As a prerequisite to recovery for an antitrust violation, a claimant must allege an antitrust injury, which is to say:

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Brunswick Corp. v. Pueblo Bowl–O–Mat,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). To meet this initial burden, an individual claiming violations of the Sherman Act must "show more than just that he was harmed by defendants' conduct." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 127 (2d Cir.1995). This requirement stems from the fundamental principle that "[t]he antitrust laws . . . were enacted for the protection of *competition,* not *competitors.*" *Brunswick,* 429 U.S. at 489, 97 S.Ct. 690. In *Brunswick,* the Supreme Court found no antitrust injury where the defendant had preserved, rather than dampened, competition by acquiring a number of the plaintiff's bowling alley competitors that would otherwise have gone out of business. 429 U.S. at 488, 97 S.Ct. 690. In responding to plaintiff's claim that the defendant's actions deprived it of profits that it would have received had its competition been allowed to fail, the Court stated "[i]t is inimical to the purposes of [the antitrust] laws to award damages for the type of

injury claimed here." *Id.* Similarly, the Second Circuit in *Balaklaw v. Lovell,* 14 F.3d 793, 796 (2d Cir.1994) dismissed claims that a hospital violated antitrust laws by entering into an exclusive contract with a group of anesthesiologists of which the plaintiff was not a member, concluding that this sort of injury was not antitrust injury because "Dr. Balaklaw's claimed injury came as a result of his losing out in the competition for an exclusive anesthesiology contract at [the hospital], and nothing more." 14 F.3d at 798.

### 1. *The Economic Theory of Monopsony*

■ Although Sony's argument takes many forms, it boils down to the position that Soundview has not alleged any injury of the nature the antitrust laws were intended to prevent, but instead seeks to enhance the remedies available for its patent claim beyond those allowed by law. According to Sony, the conduct alleged in the counterclaim does not amount to an antitrust violation, because it is not destructive of competition, but is rather procompetitive, since the law and public policy encourage the challenge of disputed patents in order to prevent the continued existence of an unwarranted monopoly resulting from an invalid patent. The antitrust laws were designed for the benefit of consumers, Sony's argument continues, and consumers would only benefit from lower production costs (here, lower costs resulting from the alleged conspiracy to pay only 5 cents per television as a licensing fee), because they would lead to lower consumer prices. In response, Soundview counters that is has adequately pleaded what is called a monopsony, or an arrangement where a buyer uses its market share power to reduce the purchase price of goods that it will use to produce its own

products.[1]

Sony challenges the economic validity of Soundview's theory, as the monopsony model upon which Soundview relies is predicated upon production reductions, resulting in higher consumer prices. *See* Areeda & Turner, *Antitrust Law,* § 574 at ¶. 299 (1999). Sony and the counterclaim defendants, however, are not alleged to have reduced input prices simply by buying fewer licenses; to the contrary, they seek a lower per unit price for those licenses, presumably to allow them to continue manufacturing a large number of television sets with the required technology. Nothing in the counterclaims alleged here indicate that Sony and the counterclaim defendants are producing fewer television sets, or that their conspiracy was to do so.

Soundview also relies on the purported harm done to the "market for innovation" by monopsonistic pricing policies, with the sole basis for this contention being the affidavit of Allyn Strickland, annexed to and incorporated in the counterclaims, an Industrial Organization economist who opines that "monopsonistic price fixing is, analytically, similar to monopolistic price fixing and poses significant harm to competition and consumer welfare" and that "[t]he economic harm inflicted by this alleged price-fixing conspiracy can affect both the technology and innovation markets in which Soundview and other firms participate by reducing their incentives to innovate and develop new technologies for television sets." Strickland Aff. ¶ 8 c, e. Strickland's affidavit does not provide an economic rationale for this opinion, other than that it is proffered by an expert, and

Sony attacks Strickland's conclusion as being logically untenable. According to Sony, it would be in the interest of the television manufacturers here to foment increased competition amongst providers of the V-chip technology: the more companies there are competing to develop and license the technology, the better chance that prices will be driven down to the 5 cents per set threshold. Fewer companies providing the technology would mean increased leverage on the part of the sellers, as the V-chip technology is crucial to the manufacture of television sets as long as the current regulations are extant.

While Sony's argument does point out some flaws in the economic underpinnings of Soundview's claims, the Court does not accept entirely Sony's argument that the scheme alleged in the counterclaims could have no anticompetitive effects. As outlined by Professor Blair, monopsonistic pricing conspiracies can have distributional injuries, such as where a group of buyers gets together and agrees on an all-or-nothing pricing scheme (as is alleged here), as contrasted with the Areeda & Turner theory about reducing the quantity of raw materials purchased in order to lower production costs. The all-or-nothing price set by these colluding purchasers can depress the price below the optimal price that would obtain if usual market forces of supply and demand were at work. The price to consumers does not decrease, but there may be social welfare consequences in the long run, because suppliers will leave the industry (or, as Soundview has it, will cease to innovate and invent). Blair, 76 Cornell L.Rev. at 367.

---

1. While both parties refer to a monopsony, the correct term would actually be *oligopsony,* which refers to a group of buyers with market power that collude to depress the price of one or more key inputs used in their production processes. *See* Roger D. Blair, Antitrust Policy and Monopsony, 76 Cornell L.Rev. 297 (1991). As Soundview utilizes the term monopsony, as do a number of the relevant cases, however, this Court will follow suit.

While this may seem counterintuitive because, for the reasons discussed above, the monopsonist purchaser's interests are not served by reducing the numbers of suppliers, business conduct is not always rational, and economic actors do not always have access to perfect information, the utopian ideal of economics. *See id.,* (discussing possible long-term consequences of all-or-nothing monopsony scenarios). Further, in the context of licenses for technology required by the government, different interests may be at work, as the manufacturers need only overturn the regulation or "invent around the patent" in order to obviate the need for Soundview's technology in the first place.

The Court concludes that a motion to dismiss is not the appropriate procedural vehicle to decide these complex questions. The counterclaims allege a conspiracy to fix prices for licenses, and the Strickland affidavit, which is incorporated into the counterclaims, posits that anticompetitive harm will result if the conspiracy is allowed to proceed unremedied. At the motion to dismiss stage, the Court must take these allegations at face value. The summary judgment case on which Sony so heavily relies, *Shapiro v. General Motors Corporation,* 472 F.Supp. 636 (D.Md.1979), is thus distinguishable, even thought the factual background of the *Shapiro* decision was strikingly similar to the instant case, involving the claims of a patent holder which sought to license its invention for an automatic seat belt retractor in the wake of federal regulations requiring installation of seatbelts on all automobiles. The patent holder learned that the "big three" automobile manufacturers had a policy of requiring "royalty-free second source licenses;" in other words, suppliers were forced to sign agreements releasing the manufacturers from paying any item-by-item royalties on patented products made by the supplier in exchange for that sup-

plier's receiving a certain share of the manufacturer's business for a given input. The district court conducted a very thorough analysis, noting that "the antitrust laws do not automatically guarantee inventors returns for their activities," and that plaintiffs therefore had some obligation to explain how harm to the market for innovation, as they described it, "is more valuable to consumers than paying lower car prices because of defendant's royalty-free licensing policy." *Id.* at 641. The court found no such evidence in the summary judgment record, reasoning:

> Plaintiffs are not being destroyed by defendants' refusal to pay them royalties. If anything, plaintiffs are either bad businessmen, poor negotiators, excessively profit-motivated, or all three. The patent laws protect their inventions, and they remain free to charge what they can get for their ideas. If they do not like the price, they simply do not have to sell. An aggrieved prospective purchaser will either do without the input or find available substitutes, possibly through 'inventing around' the patent.

*Id.* at 645. As the plaintiffs also brought a claim for patent infringement, the court determined to "narrow the case to a more appropriate focus," and granted summary judgment on the antitrust claims.

Sony urges the Court to reach the same conclusion, but while the *Shapiro* opinion provides a very insightful analysis of both the economic and legal principles implicated in a monopsony, the district court was working from a full summary judgment record, rather than merely the pleadings. A further crucial distinction between *Shapiro* and the present case is the absence of any conspiracy allegations; in *Shapiro,* the most plaintiffs could demonstrate was "conscious parallelism" on the part of the big three automakers, rather than any agreement to collude in their royalty poli-

cies. Here, in contrast, Soundview has alleged that an industry association, which markets itself as helping members "enhance their own competitive position in the marketplace" and to provide "strength in numbers" to "protect your company's business interests," Counterclaim ¶ 21, discussed its "most relevant" patent at numerous meetings, that association members did not respond to its letter announcing its intention to license its patent, and that the industry members agreed on a "reasonable" license term of 5 cents per unit. Counterclaim ¶ 37. At several points in the *Shapiro* analysis, the court suggests that the outcome might have been different had there been evidence of such unlawful conduct in that case. *See, e.g.,* 472 F.Supp. at 648. Absent evidence of such a conspiracy, the *Shapiro* court was faced with "a setting in which marketplace economics determine the ultimate value of a new invention, and where that value is determined by negotiations freely entered into between the patentee-owner and the licensee-manufacturer," and determined that it would not intervene to change the outcome of these negotiations "absent, of course, any clearly prohibited anticompetitive behavior." *Id.* at 663.

The allegations in the instant counterclaims do involve claims of anticompetitive behavior, and allege that the rejection of Soundview's license offer was not the result of marketplace economics. Soundview has alleged that the television manufacturers agreed on a license price, and that they engaged in a joint boycott and concerted refusal to deal. Counterclaim ¶¶ 51–54. Under what Soundview terms the "key monopsonization decisions," such agreements may violate the antitrust laws. *Jones Knitting Corp. v. Morgan,* 244 F.Supp. 235, 237 (E.D.Pa.1965) ("[c]oncerted refusals to buy are no less a violation of the antitrust law than concerted refusals to sell"), *aff'd,* 361 F.2d 451 (3d Cir.1966);

*Gould v. Control Laser Corp.,* 462 F.Supp. 685, 692 (M.D.Fla.1978) (declining to dismiss complaint alleging concerted refusal to buy; agreement not to take a license except under terms agreed by the group "unquestionably restrained the freedom of each group member to act as an individual producer in the laser market, free to contract or not contract with whom it chooses" and concluding that "competitive consequences of such collaborative decision making cannot be determined on the basis of the pleadings").

Sony challenges these decisions as non-binding holdings of district courts, but the Supreme Court has also recognized that monopsonistic schemes may violate the antitrust laws. *See, e.g., Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948) (agreement by group of sugar refiners to pay uniform price to sugar beet growers "is the sort of combination condemned by the Act, even though the price-fixing was by purchasers, and the persons specially injured under the treble damage claim are sellers, not customers or consumers."); *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (conspiracy by oil refiners that stabilized oil prices was unlawful, even though prices to consumers did not increase; "Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive.").

The Court is also not persuaded by Sony's argument that *Jones Knitting* and its progeny have been undermined by more recent Supreme Court guidance on antitrust injury, such as *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). All of the cases cited by plaintiff save the *Jones Knitting* opinion itself post-date the Supreme Court's seminal pronouncement on antitrust injury in the *Pueblo Bowl–O–Mat* case. Sony is correct that these cases do not discuss the requirement of antitrust injury, but they do discuss the restraints on individual liberty that these "group boycotts" involve. In the Court's view, the nature of this restraint is conceptually similar—if the individual television manufacturers are constrained by the alleged agreement from negotiating with Soundview for a license or from accepting more than five cents a set, then competition is impeded, because the individual manufacturers thus cannot make their own economic decisions. While Sony charges that the allegations of a group boycott and a concerted refusal to buy are contrived conclusions that blatantly cadge the language of *Jones Knitting*, the Counterclaims do include some factual support, such as the two EIA meetings for which minutes have not been provided, the failure of EIA members to respond to Soundview's November memo offering to license its patent, the discussion of various strategies to "avoid unreasonable royalty demands," Counterclaim ¶ 30, and the Soundview consultant's description of the discussion at an EIA meeting and his subsequent decision to terminate his relationship with Soundview. Counterclaim ¶ 34. The Court is thus not persuaded that *Jones Knitting*

and analytically similar decisions are no longer good law, and declines to dismiss the counterclaims on this ground.

■ Sony's motion attempts to hold Soundview's pleadings to a higher level of factual specificity than is required. *Conley v. Gibson* remains the operative controlling law, and a number of courts have rejected Sony's position that antitrust complaints are somehow held to a higher standard than the usual notice pleading requirements of Rule 8. *See, e.g., Corey v. Look*, 641 F.2d 32, 38 n. 10 (1st Cir.1981) ("[t]here is no special rule requiring more factual specificity in antitrust pleadings"); *Hunt–Wesson Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir.1980) (same). The Supreme Court has also held that "in antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 747, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (internal citations omitted). The Court concludes that the monopsony conspiracy outlined in Soundview's counterclaim adequately alleges the elements of an antitrust claim, including antitrust injury to competition. Whether the counterclaim defendants in this case were acting as rational economic decision-makers or participants in an illegal price-fixing conspiracy cannot be determined on the pleadings alone.[2]

### C. *Noerr–Pennington Doctrine*

■ The *Noerr–Pennington* doctrine immunizes, under the First Amendment, solicitation of governmental action even

---

**2.** After oral argument, Sony submitted a recent decision from the Southern District of New York dismissing an antitrust claim, *Floors–N–More, Inc. v. Freight Liquidators*, 142 F.Supp.2d 496 (S.D.N.Y. 2001). *Floors–N–More* cited to the Second Circuit's opinion

in *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir.1998) for the statement that "[i]n an antitrust action, it is not ... proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust

though the sole purpose of the solicitation is to restrain competition. *Rodime PLC v. Seagate Technology*, 174 F.3d 1294, 1307 (Fed.Cir.1999). The *Noerr–Pennington* doctrine generally protects those who bring patent infringement actions from antitrust liability. *Hydranautics v. FilmTec*, 204 F.3d 880 (9th Cir.2000). *Noerr–Pennington* does not protect, however, conduct which is otherwise unlawful. *Federal Trade Comm'n v. Superior Court Trial Lawyers Assoc.*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). Sony argues that cooperating to test the validity of a patent and to jointly oppose the patent is protected under the First Amendment, and that when stripped down to the facts, this is all the counterclaims allege.

In *Rodime*, the defendant had contacted several potential licensees and dissuaded them from entering into negotiations with the plaintiff-patent holder, promising to support them by filing a declaratory judgment action. Agents of the defendant had also petitioned the PTO and the Department of commerce to persuade the government to change its policies on these particular patents. 174 F.3d at 1299–300. When plaintiff sued for infringement, tortious interference and unfair competition (under state law), defendant sought to rely on the *Noerr–Pennington* doctrine, but because the court had decided that facts remained in dispute as to the legality of defendant's conduct, the doctrine was inapplicable. *Id.* The Second Circuit has also reversed a district court's dismissal on

*Noerr–Pennington* grounds in a case alleging a concerted refusal to deal by a group of broadcasters who had brought patent infringement claims against a satellite television operator. *See Primetime 24 Joint Venture v. National Broadcasting Co.*, 219 F.3d 92, 102–3 (2d Cir.2000). The court concluded that the allegations in the complaint went beyond merely offers to settle lawsuits, which the Ninth Circuit had previously held was conduct protected by *Noerr Pennington.*

Although coordinated efforts to enforce copyrights against a common infringer may be permissible, copyright holders may not agree to limit their individual freedom of action in licensing future rights to such an infringer before, during, or after the lawsuit. Such an agreement would, absent litigation, violate the Sherman Act, and cannot be immunized by the existence of a common lawsuit.

*Id.* (internal citations omitted).

As discussed above, Soundview's counterclaim contains substantially more than mere litigation or joint action to challenge a patent, in that it alleges a conspiracy to pay a maximum price and a group boycott not to accept a license from Soundview. The Court has refused Sony's request to strike the allegation of price fixing based on the Schmidt affidavit, and to disregard allegations tracking the language of *Jones Knitting* and other monopsonization decisions. The *Noerr–Pennington* doctrine is thus inapplicable at this stage in the proceedings. Of course, should the allega-

laws in ways that have not been set forth in the complaint." 142 F.Supp.2d at 499. Neither *George Haug* nor *Floors–N–More* involved patent claims, however, or factual allegations supporting claims of a conspiracy to fix prices and a concerted refusal to deal. In the *Floors–N–More* case, the district court noted that the plaintiffs failed to "provide a single fact" in support of their conspiracy allegation, and in *George Haug Co.*, the plaintiff claims that competition had been harmed due simply to the defendant's termination of it as an

authorized dealer, without any facts which allowed an inference that plaintiff's termination resulted in market concentration, reduced the number of outlets, or in any other way harmed competition. *See George Haug Co. v. Rolls Royce Motorcars*, No. 96 CIV 3140, 1997 WL 563806 (S.D.N.Y. Sept.10, 1997). Soundview's facts exceed those that appear to have been alleged in both *Floors–N–More* and *George Haug*, and thus this Court need not rely solely on conclusory statements or assumptions about unpleaded facts.

tions of price-fixing and group boycotts prove unsupported, Soundview may be left with its claims of concerted action to challenge a patent; in such a situation, *Noerr–Pennington* may well protect the conduct of Sony and the other counterclaim defendants. On the face of the counterclaims, however, Sony is not entitled to dismissal on First Amendment grounds.

### Conclusion

For the reasons discussed above, the Court concludes that the counterclaims adequately allege the requisite elements of an antitrust violation, including antitrust injury, and that the conduct alleged in those counterclaims is not protected by the First Amendment. Sony's Motion to Dismiss and for Judgment on the Pleadings [doc. # 159–1, # 159–2] is therefore DENIED.

IT IS SO ORDERED.